*Potomac Riverkeeper, Inc. D/B/A Potomac Riverkeeper*
*Network v. Maryland Department of the Environment, et al.*
Case No. 1028 September Term, 2015

**ENVIRONMENTAL LAW – ADMINISTRATIVE LAW – CLEAN WATER ACT – PERMITTING PROCESS FOR WATER TREATMENT FACILITIES.** An entity that discharges effluent into Maryland's waters must obtain a permit from the Maryland Department of the Environment ("MDE"). Sections 1-601 *et seq.* of Maryland Code (1982, 2013 Repl. Vol.), Environment Article ("EN"), provide that, before MDE may issue a permit, MDE must provide notice and opportunity for public comment. Upon issuance of the permit, persons who participated in the public comment process may seek judicial review in the circuit court. EN § 1-601(d)(1) provides: "Judicial review shall be on the administrative record before [MDE] and limited to objections raised during the public comment period, unless the petitioner demonstrates that: (i) The objections were not reasonably ascertainable during the comment period; or (ii) Grounds for the objections arose after the comment period." If the petitioning party demonstrates to the circuit court either of the exceptions listed in EN § 1-601(d)(1)(i) or (ii), the court is required to remand the matter to MDE for consideration of the newly raised objections. But the court is not required to order a remand if the objections are not materially different from those that were presented to MDE prior to the close of the public comment period.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1028

September Term, 2015

_____

POTOMAC RIVERKEEPER, INC. D/B/A
POTOMAC RIVERKEEPER NETWORK

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, et al.
_____

Woodward, C.J.,
Meredith,
Friedman,

JJ.

_____

Opinion by Meredith, J.
_____

Filed: July 26, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

The Upper Potomac River Commission, an appellee and cross-appellant, is a Maryland agency that operates a wastewater treatment facility in Allegany County, Maryland. Potomac Riverkeeper Network ("Potomac Riverkeeper"), appellant, appeals the issuance of a renewed National Pollution Discharge Elimination System permit (an "NPDES permit") that was issued to Upper Potomac River Commission by the Maryland Department of the Environment ("MDE"), also an appellee. The renewed NPDES permit authorizes Upper Potomac River Commission to discharge treated water containing residual amounts of certain pollutants into the North Branch Potomac River. A brief was also filed by Luke Paper Company, another appellee, which operates the paper mill that contributes the majority of the wastewater treated at the Upper Potomac River Commission plant.[1] The Chesapeake Bay Foundation, Inc., submitted a brief as *amicus curiae*.

After MDE published notice of its final determination to renew Upper Potomac River Commission's permit, Potomac Riverkeeper filed a petition for judicial review in the Circuit Court for Allegany County, challenging MDE's decision. Pursuant to Maryland Code (1982, 2013 Repl. Vol.), Environment Article ("EN"), §§ 1-601 *et seq.*, Potomac Riverkeeper argued in the circuit court that a remand of the permit renewal case to MDE is required because certain grounds for objections to the permit were not reasonably ascertainable during the public comment period, or, in the alternative, because

---

[1] Due to changes in ownership of the paper mill during the course of the proceedings before MDE and in the circuit court, the record refers to the owner of the mill by several names, including Westvaco, Newpage, and New Page. In this opinion we shall refer to that entity as "Luke Paper."

the grounds for Potomac Riverkeeper's objections had not arisen until after the close of the comment period. The circuit court denied Potomac Riverkeeper's request for a remand and affirmed MDE's final determination to issue the renewed NPDES permit. This appeal followed.

## QUESTIONS PRESENTED

Potomac Riverkeeper presents the following questions for our review: [2]

1.     Does § 1-601(d) of the Environment Article require a reviewing court to remand a permit to MDE when the petitioner demonstrates that an objection was not reasonably ascertainable during the comment period or that the grounds for an objection arose after the comment period?

2.     Should the Court remand the permit to MDE for consideration of Potomac Riverkeeper's objection to the new methodology for calculating [Upper Potomac River Commission's] nitrogen and phosphorus discharges, since MDE did not incorporate that methodology into the permit until after the close of the comment period?

3.     Should the Court remand the permit to MDE for consideration of Potomac Riverkeeper's objection that the permit is inconsistent with Maryland law and fails to protect the North Branch, since that objection is based on events and state agency investigations that occurred more than a year after the close of the comment period?

---

[2] Potomac Riverkeeper's questions all focus upon EN § 1-601(d), which states:

(d)(1) Judicial review shall be on the administrative record before [MDE] and limited to objections raised during the public comment period, unless the petitioner demonstrates that:

(i) The objections were not reasonably ascertainable during the comment period; or

(ii) Grounds for the objections arose after the comment period.

   (2) The court shall remand the matter to [MDE] for consideration of objections under paragraph (1) of this subsection.

2

In addition to the questions presented by the appellant, Upper Potomac River Commission presents the following question as cross-appellant: "Whether the Circuit Court erred in not granting Responder [sic] Upper Potomac River Commission's Motion to Dismiss Appellant's original Petition for Review for failure to Comply with the Maryland Code, Time for Filing."

We conclude that Potomac Riverkeeper's petition was timely filed, and answer "no" to Upper Potomac River Commission's question asking whether the circuit court erred in failing to dismiss the petition for judicial review. With respect to Potomac Riverkeeper's contentions, we hold that the circuit court did not err in declining to remand the permit to MDE. Accordingly, we shall affirm the judgment of the Circuit Court for Allegany County.

## FACTS AND PROCEDURAL BACKGROUND

**The Upper Potomac River Commission**

The Upper Potomac River Commission is "a state agency within the Department of Natural Resources created by an act of the Maryland [General Assembly] in 1936. The [Upper Potomac River] Commission operates the Savage River Dam six miles west of Luke[, Maryland,] and the waste treatment facility in Westernport . . . ." *See* "MDE Industrial Discharge Permits Division-Water Management Administration Summary Report and Fact Sheet 0230.UPRC.2013.fs.doc" (hereinafter "Summary Report and Fact Sheet"). The Summary Report and Fact Sheet provides this background information:

> The [Upper Potomac River Commission] waste treatment facility was constructed in 1960 principally to treat wastewater from the New Page (previously known as Westvaco) paper mill in Luke. It also handles

3

municipal waste from the towns of Luke and Westernport, Maryland and Piedmont, West Virginia. It treats an average of 22 million gallons per day of wastewater received from these sources in an activated sludge process. Because this plant is primarily an industrial wastewater treatment plant, several treatment steps that are not typical of activated sludge sewage plants are necessary. They include: pH control (the addition of sodium hydroxide or sulfuric acid as necessary), cooling (necessary to protect the treatment plant bacteria in the summer and to allow the plant discharge to meet the temperature and dissolved oxygen limits), and nutrient addition capability (addition of aqueous ammonia and phosphoric acid). **The effluent from this plant (Outfall 001) is discharged into the North Branch Potomac River through a dispersion structure that is designed to mix the effluent with the River.**

(Emphasis added.)

**The Clean Water Act and the National Pollution Discharge Elimination System**

The Clean Water Act (the "CWA") was enacted by Congress in 1972. In order to fulfill its stated goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," the CWA prohibits the discharge of "any pollutant by any person." 33 U.S.C. § 1251(a); 33 U.S.C. § 1311. This prohibition applies to the discharge of pollutants through a "point source." *NPDES Permit Basics*, EPA.GOV (June 13, 2018), https://perma.cc/RUN4-HUGX. 33 U.S.C. § 1362(14) defines a "point source" as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

Despite the CWA's facially total prohibition of the discharge of any pollutant, the CWA establishes a permitting system whereby holders of permits may discharge some

amount of pollutants into waterways. *See, e.g., Piney Run Preservation Ass'n v. County Com'rs of Carroll County, MD*, 268 F.3d 255, 265 (4th Cir. 2001). The Court of Appeals explained in *Maryland Dept. of Env. v. Anacostia Riverkeeper*, 447 Md. 88, 96 (2016): "Through the National Pollution Discharge Elimination System ('NPDES'), 33 U.S.C. § 1342, either the [United States] Environmental Protection Agency ('EPA') or an EPA-approved state, such as Maryland, may issue permits exempting a discharger from this [facially total] prohibition." NPDES permits issued by a state entity must contain water quality standards that meet or exceed federal standards.

In *Anacostia Riverkeeper*, the Court of Appeals provided this explanation of the NPDES permitting process as it operates in Maryland:

> MDE is the authority in Maryland that administers the NPDES program. Code of Maryland Regulations ("COMAR") 26.08.04.07. **An NPDES permit, however, does not give a discharger carte blanche. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."** *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004). These limits are called effluent limitations. *See* 33 U.S.C. § 1362(11) (defining an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance"). The type of discharge determines the type of limitations the permit must impose on the discharger.

*Id*. (emphasis added).

As provided by COMAR 26.08.04.06(1): "The term of each [NPDES] discharge permit shall be for a maximum of 5 years, unless the permit is previously amended, suspended, or revoked."

5

In the present case, Upper Potomac River Commission is considered a point source under the CWA. Consequently, it needs an NPDES permit to discharge its effluent into the North Branch Potomac River, and the NPDES permit must impose effluent limitations that meet or exceed federal standards. EN § 9-324(a).

**Total Maximum Daily Loads ("TMDLs")**

Total Maximum Daily Loads (hereinafter "TMDLs") — an important focus of Potomac Riverkeeper's contentions on appeal — "arise out of a multi-step process [under the CWA] that begins with the establishment of water quality standards ('WQS')." *Anacostia Riverkeeper*, *supra*, 447 Md. at 101. In *Anacostia Riverkeeper*, *id.* at 101-04, the Court of Appeals explained:

> Water quality standards, as the term itself suggests, protect water quality. 40 C.F.R. § 130.2(d); COMAR 26.08.02.01(A). Each state must set water quality standards by assigning a "use" to a water, such as recreation or fishing, then developing criteria to protect those uses, as well as ensuring that higher quality waters do not degrade to the minimally accepted standard (also known as an anti-degradation policy). 33 U.S.C. § 1313; COMAR 26.08.02.01(B)(1). All water quality standards are subject to EPA review, and if the EPA does not approve of them, the EPA will set those standards itself. 33 U.S.C. § 1313.
>
> * * *
>
> **After setting WQSs, the states establish effluent limitations in permits as the primary way to meet the WQSs because, as we have explained, effluent limitations restrict the discharge of pollutants.** *See* 33 U.S.C. § 1362(11). . . . Congress requires that "[e]ach State shall identify those waters within its boundaries for which the effluent limitations required by [33 U.S.C. § 1311] are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A).
>
> This is where the TMDL comes into play. **The TMDL tells a state what is *the threshold amount of a pollutant that a body of water can***

6

*tolerate* **before violating the WQS.** *See In re City of Moscow, Idaho,* 10 E.A.D. 135, 2001 WL 988721, at *4 (EAB July 27, 2001) ("A TMDL is a measure of the total amount of a pollutant from point sources, nonpoint sources and natural background, that a water quality limited segment can tolerate without violating the applicable water quality standards."); EPA, Chesapeake Bay TMDL § 1.1, at 1–2 ("A TMDL specifies the maximum amount of a pollutant that a waterbody can receive and still meet applicable WQS.").

**States must establish TMDLs "at a level necessary to implement the applicable water quality standards," 33 U.S.C. § 1313(d)(1)(C), when they identify those waters for which effluent limitations cannot implement the WQSs**, 33 U.S.C.§ 1313(d)(1)(A). **As with water quality standards, the states have the obligation of setting TMDLs and submitting them to the EPA for approval.** *See supra* MDE, John Creek Basin TMDL (The EPA approved of MDE's TMDL in March 2007.). If the EPA disapproves of the TMDLs, the EPA will set them itself. 33 U.S.C. § 1313(d)(2).

For this case, [waste load] allocations ("WLAs") are the most critical part of the TMDL equation. *See* 40 C.F.R. § 130.2(i) (A TMDL is "[t]he sum of the individual WLAs for point sources and LAs [load allocations] for nonpoint sources and natural background."). **The WLA represents a water's "loading capacity" assigned to its "point sources of pollution."** *Id.* § 130.2(h) . . . .

Although TMDLs are informational tools, of which WLAs are a part, WLAs are more akin to restrictions. *See Am. Farm Bureau Fed'n v. EPA,* 984 F.Supp.2d 289, 328 (M.D.Pa.2013) ("WLAs are not permit limits *per se*; rather they still require translation into permit limits . . . .") (citation omitted) (internal quotation marks omitted) (emphasis in original), *aff'd,* 792 F.3d 281 (3d Cir.2015). **Under 40 C.F.R. § 122.44(d)(1)(vii)(B), permitting authorities must ensure that effluent limitations "are consistent with the assumptions and requirements" of any approved WLA.**

(Emphasis added; footnotes and some internal citations omitted.)

On December 29, 2010, the EPA issued the "Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment" (the "Bay TMDL"). The EPA explained that the Bay TMDL "responds to consent decrees in Virginia and the District of

Columbia from the late 1990s." The Bay TMDL "identifies the necessary pollution reductions of nitrogen, phosphorus and sediment across Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and the District of Columbia and sets pollution limits necessary to meet applicable water quality standards in the [Chesapeake] Bay and its tidal rivers and embayments."

The Bay TMDL allocates 79,218 pounds of nitrogen and 30,773 pounds of phosphorus per year to the Upper Potomac River Commission's waste treatment operation. According to the Bay TMDL, the models upon which these calculated limits are based "all include the loads from natural background conditions because all the Bay models are mass balance models and are calibrated to observed conditions." The Bay TMDL explains:

> Natural loads of nitrogen, phosphorus, and sediment from forested land are also part of the monitored load at the free-flowing stream, river, and river input monitoring stations throughout the Chesapeake Bay watershed. Because the loads are part of the total loads to which the Chesapeake Bay Program's mass balance models are calibrated, the natural nitrogen, phosphorus, and sediment loads in the system, while small, are fully accounted for in the Bay TMDL assessment.

**The Permit Renewal Process**[3]

On April 22, 2005, Upper Potomac River Commission applied to MDE for renewal of its NPDES effluent discharge permit. On May 2, 2005, MDE notified Potomac Riverkeeper and other interested parties that "the facility discharge permit is up for renewal."

**Public Notice and Opportunities for Comment**

Subsequent to interested parties receiving notice of the treatment facility's application for a renewed permit, MDE received written input from persons concerned about the water quality of the North Branch Potomac River. One such letter, dated July 11, 2005, was authored by Kenneth Pavol on behalf of the Western Maryland

---

[3] EN § 1-604(a) describes the requirement for MDE to issue a "tentative determination," and the process that precedes MDE's final determination as follows:

> (a)     (1) After [MDE] receives the permit application, [MDE] shall prepare a tentative determination, which shall include the following information:
>
>> (i) A proposal to issue or to not issue a permit;
>>
>> (ii) Any proposed permit limitations and conditions;
>>
>> (iii) A brief explanation of [MDE's] tentative determination; and
>>
>> (iv) Any proposed schedule of compliance.
>
> (2) If the tentative determination is to issue a permit, the tentative determination shall include a draft permit, which shall be available to the public for inspection and copying.

Professional Guides Association. Mr. Pavol works as a professional fishing guide on the North Branch. Mr. Pavol's letter stated that, until his retirement several months earlier, he had been employed by the Maryland Department of Natural Resources Fisheries Service for 31 years. Mr. Pavol's letter raised concerns about the color and turbidity of the North Branch downstream from Upper Potomac River Commission. He stressed that "the typical reaction of visiting anglers when they first observe the outfall [*i.e.*, discharge of water] of the [Upper Potomac River Commission] treatment is disbelief that the discharge is legal or even possible in 2005."

Mr. Pavol also stated: "Although each permit renewal since 1990 has resulted in improvements to the [] discharge from the [Upper Potomac River Commission] plant, there is certainly room for further progress." Mr. Pavol took issue with the permit's measurement of effluent discharges on a monthly basis, which, according to Mr. Pavol, allowed for significant day-to-day variance in the appearance and odor of the North Branch. He noted that, as a result of "the apparent wide variation in daily levels of suspended solids in the effluent from the [Upper Potomac River Commission] plant, . . . the North Branch becomes highly discolored for many miles downstream, with higher levels of the associated odor as well." He stated: "[T]he wide variation in effluent quality makes it very difficult to make a case for improved conditions and provide a high quality fishing experience." Mr. Pavol also stressed that "[t]he [use of a] monthly requirement

---

(3) [MDE] shall publish a notice of the tentative determination. This publication shall allow 30 calendar days for public comment before the issuance of the final determination.

10

simply does not adequately or consistently protect downstream water quality, angling quality, [a]esthetics, and quite possibly, the fishery resource as well."

MDE held an informational meeting on September 5, 2005. A representative of Potomac Riverkeeper attended the meeting, at which the "main questions were directed toward treatment of color."

In an 18-page letter dated April 17, 2006, Potomac Riverkeeper also submitted written comments to MDE addressing the application for renewal of Upper Potomac River Commission's NPDES permit. Potomac Riverkeeper's letter encouraged MDE to impose stricter limits on the permitted discharges of nutrients, and urged MDE to "revise the [Upper Potomac River Commission] permit to contain enforceable effluent limits on nitrogen and phosphorus" rather than mere "goals" that had been included in the previously-issued permit. Potomac Riverkeeper acknowledged that Special Condition A.1 of the existing permit "specifies that these 'goals' will be revised and converted to enforceable effluent limitations upon completion of a Total Maximum Daily Load (TMDL) for the North Branch Potomac River." *Id.* at 2. But Potomac Riverkeeper explained its objection to continuing that approach in a renewal permit: "[S]ince it is uncertain whether a TMDL will be developed for nutrient loading to the North Branch of the Potomac anytime soon, and since the North Branch remains impaired because of nutrients, Potomac Riverkeeper urges MDE to revise the [Upper Potomac River Commission NPDES] permit to contain enforceable effluent limits on nitrogen and phosphorus." *Id.* at 3.

11

The comments submitted by Potomac Riverkeeper on April 17, 2006, also urged MDE to require a reduction of the discharges that affect color, and asserted that, in the data reporting effluent measurements taken during 2003 through 2005 (submitted with the application for renewal), "[t]here is not a single reported instance in which the facility is in compliance with its effluent limit relating to color. Not only is the facility never in compliance, but it is drastically out of compliance with respect to color."

In additional written comments submitted to MDE on December 20, 2006, Potomac Riverkeeper again reiterated that it had "major concerns involv[ing] the discharge of excessive color from the [Upper Potomac River Commission] facility."

**The Bay TMDL**

On December 29, 2010, the EPA issued its Bay TMDL report.

**MDE's Tentative Determination**

On February 13, 2013, MDE notified interested parties of its "tentative determination," pursuant to EN § 1-604(a)(1), to renew the Upper Potomac River Commission NPDES permit. On February 19, 2013, MDE issued the draft permit, and on March 26, 2013, MDE held a public hearing to receive comments on the draft permit. At the hearing on March 26, 2013, MDE presented a summary of the proposed terms of the permit. The transcript of the public hearing is included in the record.

In an "Overview of Permit Conditions" slide presentation, MDE explained that the renewed permit would impose more stringent limits on Upper Potomac River Commission's permission to discharge pollutants into the North Branch Potomac River.

12

We shall provide a summary of MDE's explanation of the changes to several specific parameters that were included in the draft of the renewed permit.

**Total Suspended Solids ("TSS") and Turbidity**

The quantity of Total Suspended Solids in the body of water is a factor affecting the clarity or turbidity of the water, in addition to causing problems with the odor of the water. Turbidity is a measure of the cloudiness of water and is measured in nephelometric turbidity units ("NTUs"). Drinking water has a turbidity of 1 NTU.[4]

MDE explained that the previously-issued permit's limits for Total Suspended Solids "were based on an evaluation of treatment performance during a five year period in the mid 1990s . . . . The proposed new limits are significantly more stringent." With respect to the limits in the Upper Potomac River Commission permit draft, MDE explained that "[t]he proposed end of pipe [monthly] average limit of 150 NTU and [daily] maximum of 300 NTU are new and much more stringent effluent limitations that are a result of a solids reduction program by the permittee. These limitations reflect a 62% reduction in allowed concentrations and corresponding loadings."

---

[4] The United States Geological Survey provides the following brief explanation of this measure of water quality: "Turbidity is the measure of relative clarity of a liquid. It is an optical characteristic of water and is an expression of the amount of light that is scattered by material in the water when a light is shined through the water sample. The higher the intensity of scattered light, the higher the turbidity. Material that causes water to be turbid include clay, silt, finely divided inorganic and organic matter, algae, soluble colored organic compounds, and plankton and other microscopic organisms." THE USGS WATER SCIENCE SCHOOL, https://perma.cc/6EPQ-HCZ9.

**Color**

MDE also noted that, in the renewal permit, the proposed end-of-pipe "color loading limit" would now be "expressed as a loading limit" calculated as a formula that "will achieve more consistent protection of stream color than a concentration limitation." According to MDE, "[c]olor is a complex characteristic and requires[] flexibility to implement additional recycling and water use reduction improvements that the previous permit's concentration limit would otherwise discourage or prevent." MDE further explained that the proposed in-stream color limitation for the proposed permit was 75 platinum-cobalt units ("PCU") as a weekly average, and 150 PCU as a daily maximum.

**Total Nitrogen Annual Maximum Loading Rate[5]**

With respect to the total nitrogen annual maximum loading rate, MDE stated:

[T]he allocation level [for total nitrogen] will be shown in the permit as a goal and not a limit.[6] Historical data over the past three years indicates that the facility achieves the [total nitrogen] loading allocation. While the assigned annual loading allocation is expressed as a goal, more stringent [total nitrogen] concentration limits of 3 mg/l monthly average and 6 mg/l

---

[5] Special Conditions A.1(5) stated: "Total Nitrogen is the sum of ammonia nitrogen, organic nitrogen, and nitrate-nitrogen. The permittee shall report the total and each individual concentration. Testing for all forms of nitrogen must be performed on the same sample. The permit may be reopened to propose additional nitrogen limitations upon completion of a Total Maximum Daily Load (TMDL) for the North Branch Potomac River."

[6] MDE explained in Special Conditions A.1(6): "This [draft] permit establishes a Total Nitrogen Annual Maximum Loading Rate goal of 79,218 lbs/year. Failure to attain this annual goal will not be a permit violation but the permit may be reopened after three years if the data shows that additional allocation needs to be addressed and/or a limit is appropriate." According to Special Conditions A.1(7), the "Total Phosphorus Annual Maximum Loading Rate" is 30,773 lbs/year. This loading rate for phosphorus is expressed as an enforceable "limit" rather than a goal in MDE's tentative determination.

daily maximum, limits which are not expected to inhibit the performance of the biological treatment system [utilized by the wastewater treatment plant to treat waste], are being added to the permit to ensure continued close attention to the [total nitrogen] levels.

In the Summary Report and Fact Sheet, MDE noted that some amount of nitrogen can have a positive impact on water quality, and that point had been a consideration in establishing the above-quoted conditions in the draft permit:

> [Upper Potomac River Commission] relies on addition of nitrogen as an essential treatment chemical for its biological treatment system, due to a lack of nitrogen in the untreated wastewater, necessary to meet technology based permit limits for BOD and [Total Suspended Solids]. Generally, EPA does not set effluent limits for parameters that are associated with wastewater treatment chemicals, assuming that system and site controls demonstrate good operation of the treatment technology. . . .

**Comments submitted in response to MDE's Tentative Determination**

Potomac Riverkeeper participated in the public hearing on March 26, 2013, and then submitted written comments to MDE on May 31, 2013. Among the concerns expressed in the written comments was this criticism of MDE's delay in issuing a renewed permit:

> As Potomac Riverkeeper stated at the public hearing on March 26, 2013, MDE's failure to reissue the permit in a timely manner is unacceptable. Potomac Riverkeeper urges MDE to promptly address the issues raised in these comments and at the public hearing and to ensure that future renewals are processed in a timely manner.

Potomac Riverkeeper also criticized MDE's tentative determination and draft permit for failing to impose defined limits on discharges of total nitrogen, stating:

> Potomac Riverkeeper objects to MDE's decision to express the Total Nitrogen Annual Maximum Loading Rate in the Tentative Determination as a goal, rather than an enforceable limit. Expressing the Annual Maximum Loading Rate as a goal is inconsistent with the Chesapeake Bay

15

Total Maximum Daily Load ("Bay TMDL") total nitrogen annual allocation for the [Upper Potomac River Commission] facility and Maryland's Phase II Watershed Implementation Plan ("WIP"). . . . In order to provide certainty regarding compliance with the Bay TMDL, Potomac Riverkeeper asks MDE to incorporate the annual load limit for TSS into the final permit, in addition to the daily loads already included in the Tentative Determination.

(Footnote omitted.)

In Potomac Riverkeeper's written comments submitted to MDE on May 31, 2013, it again expressed concern that "the turbidity and color limits for [Upper Potomac River Commission] remain very high, and could impact aquatic life and the aesthetic value of the North Branch [Potomac River]." Potomac Riverkeeper urged MDE to incorporate more stringent color and turbidity limits in the new permit and try to achieve "continued reductions for color and turbidity."

The public comment period closed on June 1, 2013.

**Changes Made to the Permit as Reflected in MDE's Notice of Final Determination[7]**

On July 16, 2014, MDE issued the final renewed NPDES permit, which contained

---

[7] EN § 1-604(b) describes the procedure MDE is required to follow after the close of the public comment period:

> (b)  (1) [MDE] shall prepare a final determination if:
>
> (i) Written comments adverse to the tentative determination were received by [MDE] within 30 days after the publication of the notice of tentative determination pursuant to this section;
>
> (ii) Comments adverse to the tentative determination were received in writing at, or within 5 days after, the public hearing conducted pursuant to this section;

16

the substantive terms described in MDE's notice of final determination, and was to be effective September 1, 2014. On July 28 and 29, 2014, MDE mailed notice of final determination to Potomac Riverkeeper and the other interested parties.

In the final permit issued in July 2014, MDE revised some of the terms relating to Upper Potomac River Commission's discharge of nutrients into the North Branch Potomac River. Instead of the total nitrogen annual maximum loading rate *goal* (as proposed in the draft permit), MDE had included enforceable annual maximum loading **limits** on *both* total nitrogen and phosphorus in the final permit. MDE also added language to the final permit which would allow Upper Potomac River Commission to calculate total nitrogen and phosphorus loading levels on a "net" basis that would take into account the level of those nutrients already present in the river upstream from Luke Paper. The terms of the final permit explained the method that would be used to calculate such rates on a net basis as follows:

---

(iii) Comments adverse to the tentative determination were received orally at the public hearing conducted pursuant to this section and [MDE] prepared a transcript of the comments made at the hearing; or

(iv) The final determination is substantively different from the tentative determination and all persons aggrieved by the final determination have not waived, in writing, their right to request a contested case hearing.

(2) If [MDE] is required to prepare a final determination under this section, [MDE] shall publish notice of the final determination.

17

For compliance with the loading limitation, the permittee may calculate and report the net load discharged as follows. After monitoring and reporting, at the same frequency and sample type as specified at Outfall 001, the influent river water concentration at the Newpage river water intake supply, to be designated as Monitoring Point 901, and then subtracting the monthly average concentration measured at Monitoring Point 901 from the monthly average concentration at Outfall 001, the resulting calculated concentration may then be used as "the average daily concentration for the month" in the Monthly loading Rate calculation in footnote (6) above to determine compliance with the loading limit. The average concentrations measured at Monitoring Point 901 and Outfall 001 shall each be reported on the discharge monitoring report and the reported loading shall note when it is being reported as the net load discharged using the monitoring and calculation described in this footnote.

At the time MDE issued its final determination, MDE also provided a written Response to Public Comments, responding to many of the comments it received following the issuance of its tentative determination. MDE noted that, in response to the public comment that it "must include a total nitrogen annual maximum loading rate as a limit, rather than the goal that is currently established in the draft NPDES permit," MDE had "changed the annual nitrogen loading goal . . . to a limitation in the final permit." MDE further explained: "A net limit is applicable because the source intake water used for the industrial water is river water from upstream of [Upper Potomac River Commission] and [Luke Paper], and the [Upper Potomac River Commission] facility is responsible only for the Total Nitrogen loading that is being added to the receiving waters and not the concentrations of nutrients that are already present in the river water intake."

---

(3) If [MDE] is not required to prepare a final determination under this section, the tentative determination is a final decision by [MDE] when the permit is issued or denied.

On August 4, 2014, and August 11, 2014, MDE published the required notice of final determination in *The Cumberland Times-News*, pursuant to the notice provision set forth in EN § 1-602(a)(1).[8]

In the published notice of final determination, MDE expressly notified interested parties that "[a]ny person adversely affected by this final determination may request a judicial review. The [request for] judicial review must be filed no later than **September 4, 2014** in the circuit court of the county where the activity will occur." (Emphasis in original.)

**Potomac Riverkeeper's Petition for Judicial Review and Subsequent Proceedings**

On September 4, 2014, Potomac Riverkeeper filed a petition for judicial review in the Circuit Court for Allegany County. Upper Potomac River Commission and Luke Paper Company filed responses to the petition on October 1, 2014, and October 9, 2014, respectively. (As we will discuss herein, Upper Potomac River Commission asserted that the petition for judicial review was not timely filed.)

On May 15, 2015, the circuit court held a hearing on Potomac Riverkeeper's petition, and on June 19, 2015, it affirmed MDE's issuance of the final permit. The circuit court denied Potomac Riverkeeper's request for remand of the permit to MDE. In

---

[8] The notice provision in EN § 1-602(a)(1) provides:

> (a) Wherever this subtitle requires [MDE] to publish notice:
>
> > (1) Notice shall be published at least once a week for 2 consecutive weeks in a daily or weekly newspaper of general circulation in the geographical area in which the proposed facility is located; . . . .

rejecting Potomac Riverkeeper's objections to MDE's imposition of a net basis

calculation for total nitrogen and phosphorus loading limits, the circuit court explained:

> Preliminarily, the Court finds it of no moment that the nitrogen and phosphorous limits of which Petitioner complains appears [sic] as new language in the final permit. The permitting process described in the Environment[] Article contemplates [MDE] having different language in the final permit than in the tentative determination. *See*, Md. Code Ann. Envir. Section 1-604.[9] This allows MDE to incorporate public input received during the comment period into the final permit. Thus, the question is simply to determine whether the final permit allows excessive discharges of nitrogen and phosphorus from the [Upper Potomac River Commission] facility.

> * * *

> The record reveals that the final permit imposes "net" nitrogen and phosphorus limits, allowing [Upper Potomac River Commission] to subtract nitrogen and phosphorus content in its *intake* waters from its effluent discharges. In essence[,] MDE is not holding [Upper Potomac River Commission] responsible for the pollutants upstream from the Luke Mill that are already in the water, but holding [Upper Potomac River Commission] responsible for the *additional* pollution in its discharge. Indeed, in its response to comments received on the tentative permit determination MDE said "a net limit is applicable because the source intake water used for the industrial water is river water upstream of [Upper Potomac River Commission] and [Luke Paper], and the facility is responsible only for the Total Nitrogen loading that is being added to the receiving waters and not the concentrations of nutrients that are already present in the river water intake."

(Italics in original.)

---

[9] EN § 1-604(b)(1), quoted above, requires MDE to prepare a final determination if "comments adverse to the tentative determination were received by [MDE]," as they were in this case, and also requires MDE to prepare a final determination if MDE's final permit is "substantively different from the tentative determination." But the statute makes no provision for additional public comment after MDE issues its final determination and publishes notice of its final determination pursuant to EN § 1-604(b)(2).

20

The circuit court further concluded that, because "[MDE's] decision to permit the net calculation of the total nitrogen and total phosphorus limitations is reasonable and supported by substantial evidence, it will not be disturbed by the Court."

The circuit court also rejected Potomac Riverkeeper's request to order a remand for consideration of photos and measurements recorded subsequent to the close of the public comment period. The circuit court stated:

> Petitioner asserts that the permit fails to assure [Upper Potomac River Commission] meets State water quality standards as a result of additional objectionable and unsightly discoloration of the River it observed after the comment period. For that reason alone[,] it argues[,] the Court should remand the permit to MDE.

> However, the Court is limited to reviewing the administrative record and the objections raised during the public comment period. Because [Potomac Riverkeeper's] argument is based on extra-record material, i.e., observations of additional North Branch discoloration not presented to MDE, the Court will not consider the "appearance" of the River as a basis for remand. [The court's footnote 1 added: "It is noted [that] River color, turbidity impacts, aesthetics, and appearance were issues that existed before the comment period. The attempt to introduce wholly subjective anecdotal evidence now, not showing violations of numeric water quality standards, is not fair to other parties and[,] if permitted[,] would lead to never-ending remands."]

Potomac Riverkeeper noted this appeal of the circuit court's order, and Upper Potomac River Commission noted a cross-appeal challenging timeliness.

## STANDARD OF REVIEW

"In reviewing an agency's legal conclusions, it is a fundamental principle of administrative law that a reviewing court should not substitute its judgment for the expertise of those persons who constitute the administrative agency." *John A. v. Bd. of*

21

*Educ. for Howard Cnty.*, 400 Md. 363, 381-82 (2007). *See generally Maryland Aviation Administration v. Noland*, 386 Md. 556, 571-72 (2005), where the Court of Appeals said:

> "Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the administrative agency,'["] *United Parcel v. People's Counsel, supra*, 336 Md. at 576–577, 650 A.2d at 230, quoting *Bulluck v. Pelham Wood Apts., supra*, 283 Md. at 513, 390 A.2d at 1124. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. . . .

In *Anacostia Riverkeeper*, *supra*, 447 Md. at 118-20, the Court of Appeals discussed the standard of review that applies to MDE's decision to issue an NPDES permit:

> EN § 1–601 now permits direct judicial review of agency permitting decisions without a contested case hearing. Although this statute does not set forth a standard of review, **the substantial evidence and arbitrary and capricious standards apply where an "organic statute" authorizes judicial review without a contested case hearing and does not set forth a standard of review.**
>
> * * *
>
> In a review for substantial evidence, **we ask "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached."** *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173 (2011). **We should accord deference "'to the agency's fact-finding and drawing of inferences'" when the record supports them.** *Id.* (citation omitted); *see Mayor & Aldermen of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 399, 396 A.2d 1080, 1089 (1979) ("The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.") (citation and internal quotation marks omitted). Moreover, **we shall review the agency's decision "'in the light most favorable to it.'"** *Najafi*, 418 Md. at 173, 12 A.3d at 1261. **Finally, we must accord an agency great deference regarding factual questions**

22

**involving scientific matters in its area of technical expertise.** *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376, 381 (1999) ("[T]he expertise of the agency in its own field should be respected.").

We have characterized **the arbitrary and capricious standard of review as one that is "extremely deferential."** *Harvey v. Marshall*, 389 Md. 243, 299, 884 A.2d 1171, 1205 (2005).

(Emphasis added.)

*See also Kor-Ko Ltd. v. Maryland Department of the Environment*, 451 Md. 401, 425 (2017) (the appellate court "must honor . . . the deferential standard of review that guides our assessment of the type of agency action before us").

## DISCUSSION

### I. Timeliness of Potomac Riverkeeper's Petition for Judicial Review

Prior to addressing the questions presented by Potomac Riverkeeper, we will consider whether Upper Potomac River Commission, as cross-appellant, is correct in its contention that Potomac Riverkeeper failed to file a timely petition for judicial review after MDE published notice of its final determination.

As noted above, Upper Potomac River Commission contends that Potomac Riverkeeper's petition for judicial review was filed one day after the deadline in EN § 1-605(b), which provides: "A party submitting a petition for judicial review shall file the petition within **30 days after publication of a notice of final determination**." (Emphasis added.) Upper Potomac River Commission argues that Maryland Code (2014), General Provisions Article, § 1-302(a) "specifically addresses how to properly compute time, providing that the time begins to run the day after the event described in

the statute" unless the statute requires a different method of computation.  In the present case, Upper Potomac River Commission contends that Potomac Riverkeeper's petition for judicial review was filed in the circuit court "31 days after initial publication . . . .  Although MDE's [n]otice of [f]inal [d]etermination referred in error to a required filing date of September 4 [for any petition for judicial review,] . . . MDE's courtesy statement may not supplement the Code requirement."

Potomac Riverkeeper, on the other hand, contends that its petition *was* timely filed.  It points out that EN § 1-605(b) requires those parties seeking judicial review to file "a petition 'within 30 days after publication of *a notice of final determination*.'" (Emphasis added by Potomac Riverkeeper.)  Potomac Riverkeeper points out that MDE published two notices of final determination: one on August 4, 2014, and one on August 11, 2014.  Because the statute does not require that the petition be filed within 30 days after the *initial* publication of notice of final determination — *i.e.,* the August 4 notice — Potomac Riverkeeper argues it was well within its right to file the petition within 30 days after the August 11 publication of notice of final determination, and its petition for judicial review was filed on the 24th day after August 11.

The record indicates that MDE's notice of final determination was published in *The Cumberland Times-News* two times.  MDE directed the *Times-News* to publish the notice required by EN §§ 1-602(a)(1) and 1-604(b)(2) on two specific dates, stating: "Publication Dates: Please publish on **August 4 and 11, 2014**."[10]  (Bold type in original.)

---

[10] EN § 1-604(b)(2) provides: "If the Department is required to prepare a final determination under this section, the Department shall publish a notice of the final

24

Pursuant to this directive, the notice of final determination was published on August 4, 2014, *and* on August 11, 2014.  Each of the published notices states: "The [petition for] judicial review must be filed no later than **September 4, 2014** in the circuit court of the county where the activity will occur."  (Emphasis in original.) The docket entries show that Potomac Riverkeeper filed its petition for judicial review on September 4, 2014, in compliance with the date specified by MDE in the published notice. Nevertheless, Upper Potomac River Commission argues that Potomac Riverkeeper's petition for judicial review was untimely because the 30th day after the first published notice of final determination in *The Cumberland Times-News* was September 3, 2014.

In *Sole v. Darby*, 52 Md. App. 218 (1982), we concluded that the principles of waiver and estoppel applied where the personal representatives of a decedent caused the publication of an ambiguous public notice of a filing deadline upon which a party who wished to contest the will detrimentally relied.  The public notice of appointment in *Sole* incorrectly "stated that '. . . All persons having any objections to such appointment (or to the probate of the Decedent's Will) shall file the same with the Register of Wills of Baltimore County on or before March 3, 1980 (6 months from the date of such appointment) . . . [.]'"  *Id.* at 220.  In fact, pursuant to the tolling provision in Maryland Code, Estates and Trusts Article § 5-207(a), "the last date of the six month filing period

determination."  EN § 1-602(a)(1) states:

> (a) Wherever this subtitle requires the Department to publish notice:
>> (1) Notice shall be published at least once a week for 2 consecutive weeks in a daily or weekly newspaper of general circulation in the geographical area in which the proposed facility is located[.]

would have expired on the 29th day of February 1980 . . . ." *Id.* at 221. In *Sole*, a petition to caveat was filed on March 3, 1980, *i.e.*, the deadline stated in the published notice. *Id.* We reversed the circuit court's ruling that the caveator's claim was not timely filed and therefore was properly dismissed by the orphans' court. We explained: "To require greater diligence from the [caveator] than from the Register of Wills or the personal representatives would, in our opinion, lead to an unduly harsh result." *Id.* at 224 n.1.

Our reasoning in *Sole* applies in the instant case. MDE's published notice of final determination advised interested parties (on two occasions) that any petition for judicial review must be filed "no later than September 4, 2014." Potomac Riverkeeper complied with the express language in the published notice of final determination. To hold that Potomac Riverkeeper's petition was untimely despite meeting the published deadline would, in our opinion, lead to an unjust result. *See id.* Under the circumstances, we would conclude Potomac Riverkeeper's petition for judicial review was timely filed even if we agreed that the time limit prescribed in EN § 1-605(b) begins on the day the first notice of publication appears.

But we also disagree with Upper Potomac River Commission's argument that a petition for judicial review must be filed within 30 days of MDE's *initial* publication of the notice of final determination. EN § 1-605(b) requires that a petition for judicial review be submitted "within 30 days after publication of *a notice* of final determination." (Emphasis added.) As Potomac Riverkeeper correctly points out, however, that language does not require the filing of a petition within 30 days of *the initial* publication. And

26

MDE's notice obligations are not complete upon the date of initial publication. EN § 1-602(a)(1) provides: "Notice shall be published *at least* once a week for *2 consecutive weeks . . . .*" (Emphasis added.) As mentioned above, MDE published its first notice of final determination on August 4, 2014. MDE's second notice was published on August 11, 2014. Pursuant to EN § 1-602(a)(1), MDE's notice obligation was not satisfied until its second publication of notice on August 11, 2014. For this additional reason, we conclude that Upper Potomac River Commission's argument that the time limit for filing a petition for judicial review begins to run on the date of the initial publication of notice of final determination is incorrect, and Potomac Riverkeeper's September 4, 2014, petition was timely filed.

## II. EN § 1-601(d)

In its brief, Potomac Riverkeeper contends that the circuit court erred in refusing to remand the permit to MDE for further consideration prior to its final confirmation of the permit. As noted above, EN § 1-601(d) provides that judicial review of MDE's final determination ordinarily "shall be on the administrative record before the [MDE] and limited to objections raised during the public comment period." But the statute also provides that the court "shall remand the matter to the [MDE]" if the party petitioning for judicial review can demonstrate either that "(i) The objections were not reasonably ascertainable during the comment period; or (ii) Grounds for the objections arose after the comment period." Potomac Riverkeeper asserts that, pursuant to EN § 1-601(d)(1), a remand is required because it was not reasonably ascertainable (during the period for public comment) that MDE would add to the final permit a net basis methodology for

27

calculating total nitrogen and phosphorus discharges.  Furthermore, Potomac Riverkeeper contends that the circuit court should have remanded the permit because information regarding the insufficiency of the color and turbidity limits in the final permit was acquired after the close of the comment period, and was, therefore, not reasonably ascertainable during the public comment period, and also provided grounds for an objection that arose after the comment period closed.

We have been directed to no Maryland case that thoroughly analyzes the sufficiency of a petitioning party's request for a remand pursuant to EN § 1-601(d), but federal case law on EPA-issued NPDES permits supports the appellees' position that the final version of the permit adopted in the final determination need not be identical to the one previously made available for public comment.  *See, e.g., Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 279 F.3d 1180, 1186 (9th Cir. 2002) (quoting *Trans-Pac. Freight Conference v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1249 (D.C. Cir. 1980)) ("[T]he final permit issued by the agency need not be identical to the draft permit. That would be antithetical to the whole concept of notice and comment.  Indeed, it is 'the expectation that the final rules will be somewhat different [—] and improved [—] from the rules originally proposed by the agency.'").  An alternative requirement precluding amendments could lead to a never-ending cycle of comments and revisions.

The statutory scheme for public comment on the MDE-issued permits listed in EN § 1-601(a) contemplates published notice of permit applications (EN § 1-602), informational meetings (EN § 1-603), and publication of MDE's tentative determination (EN § 1-604(a)). If the tentative determination is to grant the application, EN § 1-

28

604(a)(3) requires MDE to prepare a draft permit and "publish a notice of the tentative determination" that provides 30 days for public comment, and, if requested, hold a public hearing pursuant to EN § 1-604(a)(4). There is no statutory provision for additional public comment on MDE's final determination and revised final permit; MDE is simply required to "publish a notice of the final determination" pursuant to EN § 1-604(2), after which an eligible party may petition for judicial review of the permit pursuant to EN § 1-605 within 30 days after published notice of the final determination. At that point, the judicial review is limited to the administrative record and "limited to objections raised during the public comment period" *unless* the petitioning party can demonstrate that there are new objections that "were not reasonably ascertainable during the comment period," or "arose after the comment period" ended. EN § 1-601(d)(1). If the petitioning party demonstrates that there are genuinely new objections that are materially different from those that have already been considered by MDE, the court is required to remand the matter to MDE for consideration of the newly raised objections. EN § 1-601(d)(2). But a remand would serve no purpose, and would only introduce unnecessary delay, if the proffered new objections are not materially different from objections that were already considered by MDE.

As we shall discuss in addressing Potomac Riverkeeper's second and third questions, the information that was gathered after the close of the public comment period, and the concerns Potomac Riverkeeper raised in the circuit court regarding the final permit, were not materially different from information and objections that were presented to MDE before the close of the comment period, and, for that reason, we conclude that

29

this is not a case in which the circuit court was required by EN § 1-601(d) to remand the matter to MDE for consideration of objections that were not materially different from the objections that had previously been presented.

**III. The Net Limit for Total Nitrogen and Phosphorus**

Potomac Riverkeeper asserts that its "objection to the nitrogen and phosphorus limits happens to satisfy both [EN § 1-601(d)(1)(i) and (ii)]." In that regard, Potomac Riverkeeper contends that, "after the public comment period, MDE incorporated a new methodology for calculating nitrogen and phosphorus discharges, allowing [Upper Potomac River Commission] to exceed its Bay TMDL [waste load] allocations for those pollutants."

As noted above, in the final permit, MDE included a provision permitting the calculation of maximum loading rates on a "net" basis by monitoring the amount of nitrogen and phosphorus in the upstream river water before that water is utilized by Luke Paper and then subtracting that intake level from the quantities of nitrogen and phosphorus present in the water being discharged into the river after treatment by Upper Potomac River Commission. MDE's stated rationale for adding this net limit provision to the final permit was that Upper Potomac River Commission should not be held responsible for "the concentration of nutrients that are already present in the river water intake."

In its brief, Potomac Riverkeeper argues that the potential for MDE's inclusion of this methodology was not reasonably ascertainable before the close of the public comment period: "None of the documents available to the public during the comment

30

period mention the possibility of MDE including this new methodology . . . ." Potomac Riverkeeper asserts that "the first mention anywhere in the record of applying [Upper Potomac River Commission's] nitrogen and phosphorus limits on a net basis was on April 28, 2014, nearly eleven months after the end of the comment period, when MDE provided a revised permit, response to public comments, and [notice of] final determination in draft form to [Upper Potomac River Commission] (but not the public) for review."

Potomac Riverkeeper further asserts that the "new methodology for calculating nitrogen and phosphorus discharges actually allows [Upper Potomac River Commission] to discharge more of those pollutants into the North Branch," and that it "had no opportunity to object to the legality or practicality of this new methodology before MDE issued the final permit." Allowing such new and substantive changes in the final permit would, according to Potomac Riverkeeper, "render[] [the exceptions set forth in EN] § 1-601(d) completely meaningless." Accordingly, Potomac Riverkeeper requests that we remand the matter to the circuit court with instructions for it to remand the matter to MDE for further consideration of this objection to the final permit.

Upper Potomac River Commission denies that the grounds for objecting to use of a net calculation were not reasonably ascertainable during the comment period. It contends that a net basis calculation "simply recognizes that there are other sources of [total nitrogen and total phosphorus] for which [Upper Potomac River Commission] is not responsible. Clarification of the applicability of a net limitation was necessary to support MDE's translation of the prior nutrient 'goals' into specific enforceable

31

limitations." And the replacement of the draft permit's goals with specific enforceable limits was something expressly requested by Potomac Riverkeeper during the comment period.

Citing 40 C.F.R. § 122.45(g), which provides that, "[u]pon request of the discharger, technology-based effluent limitations or standards **shall be adjusted to reflect credit for pollutants in the discharger's intake water** [emphasis added]," Upper Potomac River Commission asserts that the use of a net limitation should not have surprised Potomac Riverkeeper, and does not provide a basis for a remand. Upper Potomac River Commission argues:

> The nitrogen and phosphorus already in the water taken in at Luke Paper is thus part of the Load Allocation included within the [upstream water's] TMDL when it reaches the [Upper Potomac River Commission] plant. To not [subtract] that Load Allocation out of the [Upper Potomac River Commission] [Waste Load] Allocation would be to count it twice within the [Bay] TMDL calculations.

MDE offers two arguments in support of its decision to incorporate the net calculation methodology in the final permit without further opportunity for public notice and comment. First, MDE cites the Bay TMDL and notes that it "establishes [waste load] allocations for discharges of total nitrogen and total phosphorus from [Upper Potomac River Commission]. In developing the [Bay TMDL's waste load] allocations, the EPA **took into account other sources of pollution, including other point source dischargers and non-point sources. Additionally, the models on which the Bay TMDL is based account for natural background pollution."** (Emphasis added.)

As urged by Potomac Riverkeeper, MDE changed the permit's annual nitrogen and phosphorus maximum loading levels to limits, replacing the unenforceable goals in the draft permit. This change in the terms of the final permit aligned the permit's limits with those found in the Bay TMDL. In its Response to Public Comments that accompanied its final determination on July 14, 2014, MDE explained its reasoning behind the change:

> A *net limit* was applicable because the source intake water used for the industrial water is river water from upstream of [Upper Potomac River Commission] . . . and the facility is responsible only for the Total Nitrogen loading that is being added to the receiving waters and not the concentrations of nutrients that are already present in the river water intake.

(Emphasis added.)[11]

MDE also argues that its inclusion of a net calculation methodology in the final permit should not have surprised Potomac Riverkeeper because the same methodology was used calculate another loading limit, namely turbidity, in the draft permit. MDE emphasizes that the draft permit available for public comment "included a water quality-based turbidity limit and allowed [Upper Potomac River Commission] to report turbidity as the net increase from a monitoring point upstream of the effluent to a monitoring point downstream." According to MDE, its use of a net increase methodology in calculating

---

[11] *See generally Kor-Ko, supra,* 451 Md. at 422 n.18, in which the Court observed: "The agency is not obliged to respond to all public comments, but rather may pick and choose where to do so."

33

another limit demonstrates that "it was reasonably ascertainable that [MDE] would do the same when adding a limit for nitrogen as requested by [Potomac] Riverkeeper."[12]

We agree with appellees, and hold that Potomac Riverkeeper failed to demonstrate that its objections fall within EN § 1-601(d)(1)'s exceptions to the general rule that judicial review "shall be on the administrative record." First, Potomac Riverkeeper's objection to MDE's implementation of a net calculation for nitrogen and phosphorus was reasonably ascertainable during the public notice and comment period because the information upon which its objection is based is not materially different from the

---

[12] In its tentative determination, MDE proposed the following net calculation methodology for reporting turbidity limits:

> Limitations apply to turbidity in the surface water, and may be measured and reported either as (1) total turbidity measured at stream Monitoring Location 01A; or as 2) the net increase in turbidity concentration that occurs between stream Monitoring Location 201 (on the Maryland side of the River approximately 25 feet upstream of Outfall 001) and stream Monitoring Location 01A. The maximum or average limitations at location 01A do not apply during periods where the Outfall 001 turbidity measurements are below the corresponding maximum or average limits at instream location 01A after considering the travel time between Outfall 001 and Monitoring Location 01A.

This same language appears in MDE's final permit under the subheading "EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS."

MDE further explained its decision to allow Upper Potomac River Commission to report its turbidity data using a net calculation in its Summary Report and Fact Sheet that accompanied the release of its tentative determination:

> The proposed in-stream limitations at downstream monitoring point 01A remain unchanged from the previous permit. . . . Water quality standards for turbidity are expressed in terms of an increase to the background, so background monitoring is optional so that the permittee may choose

34

information that was presented to MDE before the close of the comment period. Although it is true that MDE's use of a net formula to calculate "the average daily concentration per month" of the total phosphorus and total nitrogen maximum loading rates measured in lbs/year was added to the final permit after the public comment period, the draft permit employed a similar net calculation methodology for calculating turbidity. Because MDE had already employed this methodology in calculating other effluent discharges addressed in the permit, all interested parties, including Potomac Riverkeeper, were on notice that the methodology could be implemented with respect to nitrogen and phosphorus loading limits. And Potomac Riverkeeper itself urged MDE to adopt limits in place of goals for nitrogen and phosphorus.

The net calculation methodology's potential implementation was also reasonably ascertainable during the public notice and comment period because it was derived from the models used to create the Bay TMDL, which Potomac Riverkeeper was clearly aware of during the comment period. In its comments, Potomac Riverkeeper "object[ed] to MDE's decision to express the Total Nitrogen Annual Maximum Loading Rate . . . as a goal, rather than an enforceable limit," and it further asserted that "[e]xpressing the Annual Maximum Loading Rate as a goal **is inconsistent with the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL") total nitrogen allocation for the [Upper Potomac River Commission] facility** . . . ." (Emphasis added.)

---

reporting of the data as net increase only as needed for demonstrating compliance with the limitations.

Much like the above net-basis calculation utilized in the final permit, the Bay TMDL's water quality models "all include the loads from natural background conditions because all the Bay models are mass balance models and are calibrated to observed conditions." The Bay TMDL further explains:

> Natural loads of nitrogen, phosphorus, and sediment from forested land are also part of the monitored load at the free-flowing stream, river, and river input monitoring stations throughout the Chesapeake Bay watershed. **Because the loads are part of the total loads to which the Chesapeake Bay Program's mass balance models are calibrated, the natural nitrogen, phosphorus, and sediment loads in the system, while small, are fully accounted for in the Bay TMDL assessment**.

(Emphasis added.)

As previously stated, the relevant federal regulation provides that a TMDL is "[t]he sum of the individual [waste load allocations] for point sources and [load allocations] for nonpoint sources and **natural background**." 40 C.F.R. § 130.2(i) (emphasis added). 40 C.F.R. § 130.2(i) therefore provides notice that a waste load allocation limit may take into account the pre-existing or "background level" of pollution in the body of water under consideration. That regulation states:

> If a receiving water has only one point source discharger, the TMDL is the sum of that point source [waste load allocation] plus the [load allocations] for any nonpoint sources of pollution **and natural background sources, tributaries, or adjacent segments**. TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure.

40 C.F.R. § 130.2(i) (emphasis added).

The Bay TMDL itself recognizes that "background pollution" may be subtracted when calculating a permittee's authorized load maximum for a given nutrient. MDE's use of that type of calculation in its final determination was a foreseeable response to the

36

comments made by Potomac Riverkeeper during the public comment period. In authorizing a calculation methodology that allowed Upper Potomac River Commission to subtract the contribution of other point and non-point sources, MDE was responding directly to Potomac Riverkeeper's request that the permit should set *limits* rather than unenforceable "goals." It was therefore reasonably ascertainable that, if MDE revised the permit — by changing the total nitrogen and phosphorus maximum loading limits from a "goal" to an enforceable limit — the permittee would be authorized to calculate its discharge in such a way that does not hold it accountable for the pre-existing, baseline level of nutrients in the North Branch that the permittee did not discharge. *See also* 40 C.F.R. § 122.45(g) (providing for the adjustment of standards "to reflect credit for pollutants in the discharger's intake water"). We are satisfied that all interested parties, including Potomac Riverkeeper, had an adequate opportunity to anticipate and comment on these foreseeable terms of the final permit.

Moreover, although Potomac Riverkeeper asserted, and continues to assert, that MDE's implementation of a net calculation for total nitrogen and phosphorus "actually allows [Upper Potomac River Commission] to discharge more of those pollutants into the North Branch" than it could under the tentative draft permit, it directs us to no specific data in the record that validates this assertion. And when Potomac Riverkeeper presented a similar argument to the circuit court, it similarly failed to direct the circuit court to evidence to support its claim. The administrative record transmitted to the circuit court for judicial review comprised four binders containing 2414 pages, and in its "Memorandum in Support of Petition for Judicial Review," Potomac Riverkeeper argued:

37

[Potomac Riverkeeper] objects to the new language in Special Condition A.1(7) of the final permit **that allows [Upper Potomac River Commission] to discharge nitrogen and phosphorus in excess of its WLAs in the Bay TMDL for those pollutants**. For the Court to remand the permit to MDE, [Potomac Riverkeeper] need only show that its objections were 'not reasonably ascertainable during the comment period' or that the '[g]rounds for the objections arose after the comment period.' Md. Code Ann., E[N] § 1-601(d). Here, the grounds for [Potomac Riverkeeper's] objection cleary arose after the comment period because the language in Special Condition A.1(7) did not appear in the tentative determination. (*Compare* R. at 6-7 *to* R. at 439-40.) Therefore, Petitioner did not have any opportunity to object to the new language. Furthermore, the new Special Condition was not reasonably foreseeable based on the information provided by MDE with the tentative determination. The tentative determination and supporting documents did not in any way suggest that [Upper Potomac River Commission] would be allowed to subtract the nitrogen and phosphorus in LPC's intake water for the purpose of complying with [Upper Potomac River Commission's] permit limits. For these reasons alone, the Court should remand the permit to MDE to consider Petitioner's objection. *See* Md. Code Ann., E[N] § 1-601(d).

Petitioner objects to Special Condition A.1(7) because it is contrary to the "assumptions and requirements" in the Bay TMDL. *See* 40 C.F.R. § 122.44(d)(vii); *see also* Md. Code Ann., E[N] § 9-324. The Bay TMDL specifically provides nitrogen and phosphorus WLAs for [Upper Potomac River Commission] of 79,218 pounds per year and 30,773 pounds per year, respectively. (Ex. 1 at 42.) **The final permit purports to adopt those limits, (R. at 5), but actually allows [Upper Potomac River Commission] to discharge additional nitrogen and phosphorus. It does so through the new language in Special Condition A.1(7), which changes the way that [Upper Potomac River Commission] calculates nitrogen and phosphorus discharges for the purpose of permit compliance. The Special Condition states that [Upper Potomac River Commission] can calculate 'the average daily concentration for the month' by subtracting 'the monthly average concentration measured at Monitoring Point 901 [LPC's water intake supply] from the monthly average concentration at Outfall 001 [Upper Potomac River Commission's outfall]." (R. at 6-7.) Therefore, [Upper Potomac River Commission's]** *actual* **discharges of nitrogen and phosphorus can exceed the WLAs in the Bay TMDL.**

Allowing [Upper Potomac River Commission] to exceed its Bay TMDL allocations for nitrogen and phosphorus would be detrimental to the

health of the Potomac River and the Chesapeake Bay. **Pollutant levels that may be coming into any given facility were not considered in setting the individual WLAs in the Bay TMDL. (*See* Ex. 1 at 28-32 (summarizing the assumptions incorporated into the Bay TMDL allocations).) The pollutant allocations for individual facilities and other pollution sources throughout the Chesapeake Bay watershed are all inter-related and together account for the maximum amount of pollution that the Chesapeake Bay and its tributaries can tolerate. (Ex. 1 at 2.)** Therefore, allowing [Upper Potomac River Commission] to discharge additional nitrogen and phosphorus undermines the effectiveness of hundreds of other allocations and jeopardizes the overall effectiveness of the Bay TMDL in restoring the Potomac River and the Chesapeake Bay.

(Bold emphasis added.)

Although Potomac Riverkeeper repeatedly asserts that a net calculation allows Upper Potomac River Commission to "exceed" the Bay TMDL allocations for nitrogen and phosphorus, there is no estimate or description in the briefing, or that we can find in the voluminous record, regarding how much of the 79,218 pounds of nitrogen, originally expressed as a goal, was preexisting nitrogen in Luke Paper's intake water. Without any data comparing the anticipated discharges under the final permit to those allowed under the proposed draft permit, there is no way for the court to assess whether the new language in the final permit introduced a material change. Accordingly, Potomac Riverkeeper failed to "demonstrate[]" that it was entitled to a remand, pursuant to EN § 1-601(d)(2), to address an objection to a material change in the terms of the permit made by MDE after arose the comment period.

Similarly, with respect to Potomac Riverkeeper's assertion that the grounds for this objection "arose after the comment period," and therefore require a remand pursuant to EN § 1-601(d)(1)(ii), we disagree. Citing this Court's decision in *Maryland Dept. of*

39

*the Environment v. Anacostia Riverkeeper*, 222 Md. App. 153, 178 (2015), *rev'd*, 447 Md. 88 (2016), for the proposition that "the public can't comment on a program that doesn't yet exist," Potomac Riverkeeper appears to suggest that it has the right to a new comment period if any change is made to the draft permit when MDE makes its final determination. But a similar argument was rejected by the Court of Appeals in *Anacostia Riverkeeper*, *supra*, 447 Md. at 168. In that case, certain details regarding "best management practices" were subject to modification by MDE after the approval of a discharge permit. Nevertheless, the Court of Appeals concluded that "the public was able to comment on [best management practices] — the core component of the TMDL restoration plans" during the permitting process, *id.*, and, as a consequence, the Court of Appeals "conclude[d] that the public ha[d] not been deprived of notice and comment." *Id.* at 169.

Analogous reasoning applies in the present case. Here, despite some changes to the language in MDE's final permit, all interested parties, including Potomac Riverkeeper, were provided the opportunity to comment on the "core components" of the permit -- including total nitrogen and phosphorus maximum loading limits -- during the public comment period, and could have provided comments criticizing the use of net calculations for measuring compliance with the nutrient limits.

The mere fact that the net calculation language applicable to nitrogen and phosphorus was added after the public comment period is not sufficient to satisfy EN § 1-601(d)(1)(ii) and require remand of a permit to MDE. Such an interpretation would expand the exception to the point that it swallows the rule and would introduce a

40

potentially perpetual review and revise cycle in the permitting process. When Potomac Riverkeeper submitted its comments to MDE, it was on notice that the Bay TMDL's annual maximum nutrient loading limits were calculated on a net basis, and had notice that MDE's tentative determination provided for calculating the load limit for turbidity on a net basis. Therefore, it was foreseeable that, if MDE adopted Potomac Riverkeeper's request to replace the goals with limits, the final permit could employ the same methodology to calculate other loading limits. If Potomac Riverkeeper had additional comments to provide MDE regarding the methodology for calculating compliance with the limits, it could have provided guidance to MDE during the comment period. The inclusion of this language in the final permit did not require the court to remand the case to MDE.

## IV. Information Gathered After the Close of the Comment Period

Potomac Riverkeeper's second argument in support of the request for a remand asserts that, "in the spring and summer of 2014, a year after the public comment period closed, events and state agency investigations [of the North Branch Potomac River's color and turbidity] showed that the new permit is inconsistent with Maryland law and fails to protect the North Branch." Accordingly, Potomac Riverkeeper argues that EN § 1-601(d) required the circuit court (and similarly requires this Court) to remand the case to MDE for further consideration of these objections that "arose after the close of the comment period."

Potomac Riverkeeper contends that information gathered after the close of the public comment period shows that the NPDES permit issued to Upper Potomac River

Commission violates Maryland and federal water quality standards and effluent limitations, citing the "narrative water quality criteria" in COMAR 26.08.02.03(B)(2), which provide:

> The waters of this State may not be polluted by . . . [a]ny material, including floating debris, oil, grease, scum, sludge, and other floating materials attributable to sewage, industrial waste, or other waste in amounts sufficient to: (a) Be unsightly; (b) Produce taste or odor; (c) Change the existing color to produce objectionable color for aesthetic purposes; (d) Create a nuisance; or (e) Interfere directly or indirectly with designated uses . . . .

Because these unquantified, narrative water quality standards are difficult to enforce, COMAR provides enforceable, numeric water quality criteria to accompany these narrative standards. COMAR 26.08.02.03-3A(5)-(6) provide that turbidity "may not exceed 150 units at any time or 50 units as a monthly average," and color "may not exceed 75 units as a monthly average." Prior to issuing a discharge permit, MDE is required to find that the permitted discharge meets "[a]ll applicable State and federal water quality standards and effluent limitations." EN § 9-324(a).

As Potomac Riverkeeper points out, in 2014, after the public comment period closed, State agencies collected data on the color and turbidity of the river near Upper Potomac River Commission's outflow. Potomac Riverkeeper cites a Department of Natural Resources report which indicates that, on July 15, 2014, the river was in an "[u]nfishable condition at 20.5 NTUs (Daily Avg Limit is 50 NTUs.)" In its brief, Potomac Riverkeeper includes a photograph date-stamped July 12, 2014, from a Department of Natural Resources presentation which, Potomac Riverkeeper contends, "shows that [the permit's] new, more stringent limits for color and turbidity fail to

42

prevent [Upper Potomac River Commission] from causing unsightly and objectionable discoloration that interferes with the North Branch's designated uses, such as swimming and fishing." Potomac Riverkeeper states that, in this photograph, the effluent turbidity was at 280 NTU, and the effluent color was at 370 PCU.

Potomac Riverkeeper also offers the December 2014 declaration of Kenneth Pavol, who asserted that, in 2014, *i.e.*, after the public comment period closed, he "observed discoloration of the North Branch from [Upper Potomac River Commission] much more frequently than in previous years." Mr. Pavol declared that Upper Potomac River Commission's "discharge was also significantly darker and more opaque than I have seen in the past 5 to 10 years . . . . On some days I cannot see my oar past six inches into the water and the decrease in visibility is noticeable for approximately 20 miles downstream."

On appeal, Potomac Riverkeeper contends that these 2014 photos and observations require this Court — pursuant to EN § 1-601(d)(2) — to remand the permit to MDE for further consideration of the argument that the current permit's color and turbidity standards fail to adequately protect the North Branch Potomac River.

Preliminarily, Potomac Riverkeeper argues that the "circuit court erroneously concluded that [the court] could not consider the evidence that arose in 2014 because it was not reflected in the administrative record." Potomac Riverkeeper argues that it was obviously not possible to present this particular evidence during the administrative process because it became available only after the opportunity for public comment had closed, and some of the information did not become available until the final

43

determination had been made. According to Potomac Riverkeeper, the above-mentioned evidence can be properly considered for the "limited purpose of demonstrating that the grounds for an objection arose after the comment period" as contemplated by EN § 1-601(d)(1)(ii). Potomac Riverkeeper argues that, because "no remotely similar information was available to the public during the comment period," EN § 1-601(d)(1)(ii)'s exception is satisfied, and therefore, because EN § 1-601(d)(2) states that "the court shall remand the matter" if the petitioner demonstrates either of the circumstances described in EN § 1-601(d)(1), a remand is required for MDE to consider objections based on this evidence.

We agree with Potomac Riverkeeper's contention that the circuit court applied an erroneous standard for excluding consideration of the information gathered after the close of the comment period, and we disapprove of the circuit court's stated rationale that, "[b]ecause [Potomac Riverkeeper's] argument is based on extra-record material, *i.e.*, observations of additional North Branch discoloration not presented to MDE, the Court will not consider the 'appearance' of the River as a basis for remand." Although, for the reasons explained herein, we agree with the circuit court's conclusion that a remand is not required, we agree with Potomac Riverkeeper's assertion that extra-record material *may* be considered for the limited purpose of determining whether the objection raised during judicial review falls within EN § 1-601(d)(1)'s exceptions. Such a determination will necessarily, at times, require the consideration of extra-record material to analyze whether grounds for an objection "arose after the comment period," or "were not reasonably ascertainable during the comment period." *Id*.

44

But, in this case, the appellees assert that the objections that Potomac Riverkeeper raised in the circuit court in support of the request for a remand were not materially different from objections that had already been considered. With respect to color, MDE contends that Potomac Riverkeeper did not demonstrate that the grounds for its objections regarding the insufficient color and turbidity limits arose after the public comment period closed. First, MDE points to the letter it received from Kenneth Pavol in 2005. In that letter, Mr. Pavol similarly "argued that [Upper Potomac River Commission's] discharge caused discoloration which negatively impacted fishing quality and aesthetics." MDE also points to Potomac Riverkeeper's own comments to MDE in 2006, at which time Potomac Riverkeeper "argued that the in-stream turbidity limits of the previous permit, set at 150 NTU maximum and 50 NTU average in accordance with the water quality standard, were not adequate to protect aquatic life."

MDE also argues that, in written comments submitted on May 31, 2013, Potomac Riverkeeper "addressed color and turbidity in relation to aesthetics and aquatic life." In that letter, Potomac Riverkeeper observed that "the proposed limits were the 'maximum allowed by Maryland's Water Quality Criteria for Use I waters.'" Furthermore, MDE notes that the color and turbidity levels measured by the Department of Natural Resources in 2014 were not materially different from the levels measured in 2004 and 2012.

And, although MDE is not required to address all public comments when it issues its final determination, *see Kor-Ko, supra*, 451 Md. at 422 n.18, in MDE's Response to Public Comments that accompanied the final determination, MDE provided a response to

45

a comment it had received requesting "continued reductions for color and turbidity," stating:

> The final permit issued to [Upper Potomac River Commission] includes authority for [MDE] to reopen the permit in the future to address any new technology controls for color at industrial user [Luke Paper] resulting from the Pretreatment Permit issued to [Luke Paper] that requires additional efforts to control color. The final permit for [Upper Potomac River Commission] also gives the Department authority to reopen the permit to address any new or additional water quality issues resulting from the [Upper Potomac River Commission] discharge.

In Luke Paper's brief, the company contends that the objection raised by Potomac Riverkeeper was reasonably ascertainable during the comment period, and that "the conditions that purportedly created grounds for [its] objection existed before and during the comment period." Luke Paper argues: "The record documents fluctuations in turbidity and color, and prior to the end of the public comment period, levels have occasionally been in the precise range that [Potomac Riverkeeper] now asserts as new." Luke Paper further asserts that Potomac Riverkeeper is merely "repackaging" the same types of assertions it made during the comment process to frame it as a new argument. Because of these earlier assertions, and because the "public had ample access to view both the river and related data before and during the public comment period," Luke Paper argues that Potomac Riverkeeper's objection does not fall within EN § 1-601(d)(1)'s exceptional circumstances that require a remand.

We agree with appellees' argument that Potomac Riverkeeper's objections regarding the efficacy of the color and turbidity permit levels do not fall under either of EN § 1-601(d)(1)'s exceptions to the general rule that "[j]udicial review shall be on the

46

administrative record before [MDE] and limited to objections raised during the public comment period . . . ." First, the essence of Potomac Riverkeeper's "new" objections regarding color and turbidity limits was reasonably ascertainable during the public notice and comment period. Potomac Riverkeeper submitted comments to MDE regarding the proposed permit renewal on April 17, 2006, in which it requested stricter limits for both color and turbidity. On December 20, 2006, Potomac Riverkeeper sent a letter to MDE which indicated that one of its "major concerns involved the discharge of excessive color from the [Upper Potomac River Commission] facility."

In a letter dated April 3, 2013, Potomac Riverkeeper requested that MDE provide a "detailed explanation of the conversion factor and limit for color in the Tentative Determination," and further inquired as to "what impact [] the proposed limit for color [will] have on water quality . . . ."

In Potomac Riverkeeper's written comments to MDE dated May 31, 2013, it urged MDE to include stricter color and turbidity limits in the permit:

> Potomac Riverkeeper appreciates the reductions in color and turbidity discharges achieved by [Upper Potomac River Commission] since the initiation of the preceding permit term. Despite the improvements, **however, the turbidity and color limits for [Upper Potomac River Commission] remain very high, and could impact aquatic life and the aesthetic value of the North Branch.** Potomac Riverkeeper notes that the in-stream limits for turbidity and color are the maximum allowed by Maryland's Water Quality Criteria for Use I waters**. Potomac Riverkeeper urges MDE and [Upper Potomac River Commission] to investigate opportunities to achieve further reductions to protect and improve the water quality of the North Branch**.

(Emphasis added.)

47

The above-mentioned comments, all of which were provided prior to or during the public comment period, indicate that Potomac Riverkeeper always had concerns about the permit's color and turbidity limits. And, as the record demonstrates, Potomac Riverkeeper did, in fact, comment on these limits multiple times. Therefore, it was reasonably ascertainable during the public comment period that the limits prescribed by MDE in its tentative determination (which remained the same in the final permit) would have generated concerns that were not materially different from those raised in the circuit court.

We conclude that the grounds for Potomac Riverkeeper's proffered objection about color and turbidity did not arise after the comment period because information regarding fluctuating color and turbidity levels was readily available both before and during the comment period, and even if the previously available data and photos were not identical to the information gathered after the close of the public comment period, the information was not materially different.

For example, in comments submitted to MDE in 2006, Potomac Riverkeeper addressed color limits, stating:

> The [Upper Potomac River Commission] facility is not in compliance with its effluent limitation on color. In its renewal application, [Upper Potomac River Commission] reports a maximum daily value of 550 PCU, a maximum monthly value of 427 PCU, and a long term average of 384 PCU. **The permit application includes data sets reporting effluent measurements taken between 2003 and 2005. There is not a single reported instance in which the facility is in compliance with its effluent limit relating to color. Not only is the facility never in compliance, but it is drastically out of compliance with respect to color**.

(Emphasis added.)

48

Therefore, Potomac Riverkeeper's own comment to MDE demonstrates that the problems stemming from MDE's limits on color did not arise for the first time after the close of the public comment period. The fact that Potomac Riverkeeper repeatedly commented on the efficacy of the color and turbidity limits during the public notice and comment period lends credence to Luke Paper's assertion in its brief that "[Potomac Riverkeeper] cannot credibly maintain that the very issue it repeatedly commented on during the comment period was not ascertainable during the comment period."

Nor does the proffered photograph from the Department of Natural Resources, reproduced in Potomac Riverkeeper's brief, shed any materially different light on the issue. According to this picture of the effluent in the North Branch Potomac River on July 12, 2014, the effluent turbidity level was 280 NTU and the effluent color was 370 PtCo. But, as disturbing as the photo appears, it does not provide new information of a problem that had never been observable prior to the close of the public comment period. Information from MDE regarding color and turbidity levels over the years shows that, on certain days, the turbidity and color could be measured at even higher rates than those measured in 2014. For example, on January 23, 2012, turbidity was measured at 450 NTU and color was measured at 880 units. In October 2009, the *average* color measurement for the month was 327 units, with a high measurement of 530 units recorded on October 14, 2009. These are not the only instances when the turbidity and/or color were measured at higher rates than those measured by the Department of Natural Resources in July 2014. Although the Department of Natural Resources's more recent findings are understandably of concern to Potomac Riverkeeper (and undoubtedly

49

others), they do not demonstrate symptoms that could not have been anticipated before the close of the public comment period or establish new grounds for objection that arose after the close of the public comment period.

Similarly, Potomac Riverkeeper's reference to the personal observations of Kenneth Pavol also fails to demonstrate that the conditions Mr. Pavol observed after the close of the public comment period were materially different from the conditions he had brought to the attention of MDE prior to the close of the comment period. As mentioned above, Mr. Pavol provided an affidavit dated December 4, 2014, in which he declared that, beginning in May 2014, he had "observed discoloration of the North Branch from [discharges by Upper Potomac River Commission] much more frequently than in previous years. . . . On some days [he could not] see [his] oar past six inches into the water . . . ." But, as MDE points out, Mr. Pavol had written similar letters to MDE in the past. In 2005, Mr. Pavol wrote that his "particular concern is the apparent wide variation in daily levels of suspended solids in the effluent from the [Upper Potomac River Commission] plant. As a result, the North Branch becomes highly discolored for many miles downstream . . . ." These 2005 observations, according to Mr. Pavol, led him "to question whether the effluent is actually within the permit requirements." Mr. Pavol's 2005 observations negate Potomac Riverkeeper's assertion that his 2014 comments provided a new basis for objecting to the effluent limits in Upper Potomac River Commission's permit that arose only after the public comment period had closed.

Because Potomac Riverkeeper failed to demonstrate that its objections regarding the efficacy of the color and turbidity limits in the permit fall under either of EN § 1-

601(d)(1)'s narrow exceptions to the requirement that judicial review is limited to the administrative record and the objections raised during the public comment period, we affirm the circuit court's denial of the request for a remand, and its judgment affirming the final determination of MDE.

**JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**