*Maryland Small MS4 Coalition, et al. v. Maryland Department of the Environment*, No. 1865, September Term 2019.
Opinion by Harrell, J.


**1.     ADMINISTRATIVE LAW AND PROCEDURE -** County permittee was entitled to remand of a decision of the Department of the Environment which designated areas outside of the county's actual urbanized area for coverage under a federal stormwater discharge permit where objections to the Department's decision were not ascertainable reasonably during the public comment period but arose after the comment period closed. Md. Code, Environment Article § 1-601(d).

**2.     ENVIRONMENTAL LAW** – Federal stormwater discharge permit issued to a small municipal separate storm sewer system ("small MS4") must contain water quality based effluent limitations consistent with assumptions and requirements of the applicable wasteload allocation established in the Chesapeake Bay Total Maximum Daily Load ("TMDL") and allocated to regulated stormwater sources in the Maryland Watershed Implementation Plan. 40 C.F.R. § 122.44(d)(1)(vii)(B).

**3.     ENVIRONMENTAL LAW** – The Department of the Environment is authorized to include terms and conditions in a permit issued to a regulated small MS4 that are more stringent than federal regulations require, where such terms and conditions are based on an approved TMDL or equivalent analysis, and the Department determines that such terms and conditions are needed to protect water quality.  40 C.F.R. § 122.34(c)(1).

**4.     ENVIRONMENTAL LAW** – The Department of the Environment did not exceed its authority under the Clean Water Act when it directed small permittees to calculate impervious surface restoration requirements using total impervious acreage within the urbanized area as a baseline. Impervious surface restoration requirement represents a valid reallocation of pollutant loads from nonpoint sources to point sources, in order to achieve water quality standards based on the Chesapeake Bay TMDL.

**5.     ENVIRONMENTAL LAW** – The Department of the Environment did not act arbitrarily or capriciously in establishing permit provisions for federally-required control measures designed to detect/eliminate illicit discharges into the MS4 and prevent or reduce pollutant runoff from land owned or operated by the county.  The administrative record reveals a rational basis for and/or substantial evidence to support the Department's decision to include the permit requirements.

Circuit Court for Queen Anne's County
Case No. C-17-CV-18-000162

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1865

September Term, 2019

_____

MARYLAND SMALL MS4 COALITION, ET
AL.

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT

_____

Beachley,
Wells,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Harrell, J.

_____

Filed:  April 29, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

\* Kehoe, J., did not participate in the Court's
decision to report this opinion pursuant to
Maryland Rule 8-605.1.

"Letting the days go by, let the water hold me down
Letting the days go by, water flowing underground
Into the blue again, into the silent water
Under the rocks and stones, there is water underground."

> Lyrics from "Once in a Lifetime" from the album "Remain In Light" by The Talking Heads (Sire Records, 1981).

This appeal flows from a petition, filed in the Circuit Court for Queen Anne's County, requesting judicial review of a final determination of the Maryland Department of the Environment ("Department"), appellee, to issue a conditional general stormwater discharge permit to a number of operators of "small" municipal separate storm sewer systems (MS4s) (we shall do a deeper dive explaining this term shortly), including Queen Anne's County ("the County"), appellant. The circuit court affirmed the Department's final determination.

The County noted an appeal from the decision of the circuit court, presenting the following questions for our consideration:

1. Has [the Department] acted unlawfully by designating geographic areas outside of the urbanized area for regulation under the General Permit?

2. Has [the Department] unlawfully made the County responsible for discharges from independent third parties and nonpoint source runoff that does not flow into or discharge from the County's MS4?

3. Has [the Department] unlawfully imposed requirements beyond the maximum extent practicable in the General Permit?

For the following reasons, we shall vacate, in part, the judgment of the circuit court and remand to that court with instructions to remand the matter to the Department for further proceedings consistent with this opinion. We shall affirm otherwise the judgment.

# BACKGROUND

## A. *Statutory and Regulatory Scheme*

The permit here was issued by the Department pursuant to authorization under the federal Clean Water Act, 33 U.S.C. § 1251 through § 1388 ("CWA"). Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the core provisions of the CWA is § 1311(a), which "generally prohibits 'any person' from discharging pollutants from a point source into a waterway."[1] *Maryland Department of the Environment v. County Commissioners of Carroll County*, 465 Md. 169, 184 (2019) (quoting 33 U.S.C. § 1311(a)) (footnotes omitted), *cert. denied sub nom. County Commissioners of Carroll County, Maryland v. Maryland Dep't of the Env't*, 140 S. Ct. 1265 (2020).

"Through the National Pollution Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, either the Environmental Protection Agency ("EPA") or an EPA-approved state, such as Maryland, may issue permits exempting a discharger from this prohibition." *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88, 96 (2016) (footnote omitted). The Department is authorized by the EPA to administer the NPDES program in Maryland. *Id.* (citing Code of Maryland Regulations ("COMAR") 26.08.04.07).

---

[1] "'[P]erson' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, [or other types of conveyance], from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

Maryland's NPDES permit program must be consistent with the CWA and with EPA guidelines. 33 U.S.C. § 1342(c)(2). "To achieve water quality standards, the [CWA] requires that discharge permits include pollution controls for point sources." *Carroll County*, 465 Md. at 186 (citing 33 U.S.C. § 1311(b)).

"'Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters.'" *Anacostia Riverkeeper*, 447 Md. at 96 (quoting *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 (2004)). "These limits are called effluent limitations."[2] *Id.*

At issue in this appeal is a permit for a type of "point source" discharge known as a municipal separate storm sewer system, commonly referred to as an MS4. "An MS4 is a network of conveyances (including storm drains, gutters, and other drainage systems) designed to carry only stormwater (as opposed to a 'combined sewer system' that conveys both sanitary sewage and stormwater)." *Carroll County*, 465 Md. at 188 (citing 40 C.F.R. § 122.26(b)(8)). "Stormwater" is the "rain and snowmelt that filters through the soil and courses over surfaces – collecting pollutants along the way – before passing through the municipal storm sewer systems and into waterbodies." *Anacostia Riverkeeper*, 447 Md. at 97 (footnote omitted).

---

[2] An "effluent limitation" is defined as "any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

MS4s differ from other "point sources" of water pollution, such as a discharge pipe from a factory, in that the quantity and quality of stormwater that is conveyed by an MS4 into a waterway varies, depending on weather and land use practices. *Carroll County*, 465 Md. at 188-89. In addition, it is "difficult to discern the amount of pollutant that any one [MS4] discharger contributes to a waterbody because municipalities have so many outfalls, or discharge points, leading into the waters." *Anacostia Riverkeeper*, 447 Md. at 98. Accordingly, instead of numerical effluent limitations, "an MS4 permit generally requires the permittee to implement flexible management programs designed to reduce the pollution introduced into stormwater, thereby limiting the amount of pollution discharged into the waterway." *Carroll County*, 465 Md. at 189 (footnote omitted). Under the CWA, municipal stormwater permits must require "controls" that will "reduce the discharge of pollutants to the maximum extent practicable[.]" 33 U.S.C. § 1342(p)(3)(B)(iii). The required "controls" include "management practices, control techniques and system, design and engineering methods," as well as "such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants." *Id.*

"Best management practices," or, as they are commonly referred to, "BMPs," "have been a long-standing control or effluent limitation in MS4 permits." *Anacostia Riverkeeper*, 447 Md. at 99 (citing 40 C.F.R. §§ 122.44(k)(2) and (3)). EPA regulations define BMPs as "[m]ethods, measures or practices selected by an agency to meet its nonpoint source control needs." 40 C.F.R. § 130.2(m). "BMPs include but are not limited to structural and nonstructural controls and operation and maintenance procedures." *Id.* The EPA has defined BMPs more specifically, stating that "BMPs can be either

4

nonstructural (good housekeeping practices, pollution prevention, contour plowing, cover crops) or structural (wet or dry detention ponds), and can include treatment requirements, operating procedures, and practices to control site runoff, spillage, or leaks."[3]

The NPDES discharge permit program for MS4s has been put into operation in two phases, beginning with systems serving larger and denser populations. Phase I included "large" MS4s, which serve populations of 250,000 or more, and "medium" MS4s, which serve populations of 100,000 to 249,999. *Carroll County*, 465 Md. at 243-44.[4] Phase II extended the permit requirement to "small" MS4s, such as those operated by the County, which serve fewer than 100,000 people. *Id.* at 245. The permit at issue here is a Phase II general permit issued to a group of small MS4 operators.[5]

Significantly, not all small MS4s are subject to regulation under the NPDES program. Operators of small MS4s, including, but not limited to, systems operated by federal, state and local governments, require a permit to discharge stormwater only if: (1)

---

[3] EPA, Introduction to the Clean Water Act at 81, available at https://cfpub.epa.gov/watertrain/pdf/modules/introtocwa.pdf (last visited 25 March 2021).

[4] Also included in Phase I were MS4s that were "determined by the EPA or a state to be significant contributors of pollutants, regardless of the size of the population served by those MS4s." *Maryland Dep't of the Env't v. County Commissioners of Carroll County*, 465 Md. 169, 243-44 (2019), *cert. denied sub nom. County Commissioners of Carroll County, Maryland v. Maryland Dep't of the Env't*, 140 S. Ct. 1265 (2020).

[5] A general permit sets forth required terms and conditions applicable to all eligible small MS4s, although additional terms and conditions may be established for individual small MS4 operators. 40 C.F.R. § 122.28(d). A permittee complies with permit application requirements by submitting a notice of intent. 40 C.F.R. § 122.28 (d)(2)(i).

the small MS4 is located within an "urbanized area,"[6] 40 C.F.R. § 122.32(a)(1); (2) the Department determines that storm water discharge from the small MS4 "results in or has the potential to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts" 40 C.F.R. 123.35(b)(1); or (3) the Department determines that stormwater discharge from the small MS4 "contributes substantially to the pollutant loadings of a physically interconnected municipal separate storm water sewer that is regulated by the NPDES storm water program." 40 C.F.R. 123.35(b)(4). Only the first two conditions are relevant here.

To determine whether small MS4s that are located outside of an urbanized area should be subject to regulation, the Department must first "[d]evelop criteria to evaluate whether a storm water discharge results in or has the potential to result in exceedances of water quality standards, including impairment of designated uses, or other significant water impacts, including habitat and biological impacts." 40 C.F.R. § 123.35(b)(1)(i). The permitting authority then must apply that criteria to small MS4s located outside of an urbanized area.[7] 40 C.F.R. § 123.35(b)(2). Any small MS4 that meets the criteria must be designated for regulation and issued a discharge permit. 40 C.F.R. § 123.35(b)(3), (d).

_____

[6] For purposes of the NPDES permit program, an "urbanized area" is "determined by the latest Decennial Census by the Bureau of the Census." 40 C.F.R. § 122.32(a)(1). "If [a] small MS4 is not located entirely within an urbanized area, only the portion that is within the urbanized area is regulated[.]" *Id.*

[7] The regulations require that the criteria be applied "at a minimum, to any small MS4 located outside of an urbanized area serving a jurisdiction with a population density

(continued)

Under certain conditions, the Department may waive or phase-in the requirements applicable to regulated small MS4s. 40 C.F.R. § 122.32(d) and (e); § 123.35(d). Where a general permit is issued, an owner or operator of a small MS4 may request to be excluded from the coverage of the general permit by applying for an individual permit. 40 C.F.R. § 122.28(b)(3)(iii).[8]

The procedure the Department must follow in issuing a permit is set forth in the Environment ("EN") Article. It requires "published notice of permit applications (EN § 1-602), informational meetings (EN § 1-603), and publication of [the Department's] tentative determination (EN § 1-604(a))." *Potomac Riverkeeper, Inc. v. Maryland Department of the Environment*, 238 Md. App. 174, 204 (2018). "If the tentative determination is to [issue the permit], EN § 1-604(a)(3) requires [the Department] to prepare a draft permit and 'publish a notice of the tentative determination' that provides 30 days for public comment, and, if requested, hold a public hearing pursuant to EN § 1-604(a)(4)." *Id.*

If, during the notice and comment period, the Department receives comments adverse to its tentative determination, the Department is required to prepare and publish a notice of the final determination. EN § 1-604(b).[9] "[T]he final version of the permit

---

of at least 1,000 people per square mile and a population of at least 10,000[.]" 40 C.F.R. § 123.35(b)(2).

[8] The County has not tested these waters.

[9] "If the Department is not required to prepare a final determination . . . the tentative determination is a final decision by the Department when the permit is issued or denied." EN § 1-604(b)(3).

adopted in the final determination need not be identical to the one previously made available for public comment." *Potomac Riverkeeper*, 238 Md. App. at 204. As we have observed, "[a]n alternative requirement precluding amendments could lead to a never-ending cycle of comments and revisions." *Id.* Moreover, there is no provision for additional public comment on the Department's final determination and revised final permit. *Id.*

A final determination of the Department to issue a discharge permit is subject to judicial review in the circuit court. EN § 1-601(c). The decision of the circuit court may be appealed to this Court. EN § 1-601(e)(2).

**B. *Tentative Determination***

On 22 December 2016, the Department notified the County and 34 other counties and municipalities of its tentative determination to issue an NPDES general permit for discharges from small MS4s. The County was one of 13 newly designated for coverage under the Phase II permitting process. A draft of the permit was made available for review. The Department advised that a public hearing concerning the tentative determination would be held on 6 February 2017, and that written comments concerning the tentative determination would be accepted through 30 March 2017.

Pertinent to this appeal, the Department's tentative determination was that all MS4s throughout the County were subject to regulation under the general permit. The Department's stated justification was that the County as a whole "is located within an urbanized area."

8

Also relevant is a proposed condition of the permit that requires permittees to initiate efforts to restore twenty percent of the total impervious surface area within the urbanized area of the MS4 jurisdiction that has little or no stormwater management.[10]  Permittees are required to perform watershed assessments, identify water quality improvement opportunities, secure appropriate funding, and develop an implementation schedule to demonstrate that the twenty percent impervious area restoration requirement will be achieved by 2025.

## C.  Comment Period

The County participated in the public hearing.  Todd Mohn, the County's Director of Public Works, gave brief comments in which he questioned the County-wide designation based on location within an urbanized area.  Mr. Mohn stated that the tentative determination was still under review and that the County reserved the right to provide further comment.

In written comments submitted on 30 March 2017, the County maintained that the scope of the proposed permit was overbroad, as less than four percent of the County fell within an urbanized area as defined by statute and regulation.  The County commented further that the draft permit should be clarified to state that the twenty percent restoration

---

[10]  An "impervious surface" is an area that has "been paved or otherwise developed, as opposed to natural, undeveloped areas." *Carroll County*, 465 Md. at 195.  "To 'restore' an impervious surface is to make it function more like a natural terrain that absorbs and filters rain water." *Id*.  Examples of restoration efforts listed in the general permit include environmental site design, structural stormwater controls, retrofitting, and stream restoration.

requirement applied only to the impervious coverage within the legitimate urbanized area that is served by the County's MS4. The County expressed support for the joint comments submitted by the Maryland Association of Counties, the Maryland Municipal League, and the Maryland Municipal Stormwater Association (collectively, "Associations").

One of the concerns articulated in the Associations' comments was that the Department had stated and applied improperly the criteria for designating small MS4s for coverage:

> [t]he Draft [general permit] appears to designate an entire jurisdiction if only a part of the jurisdiction is within an [urbanized area]. This is manifestly improper. [The Department] should clarify in the final [general permit] and Fact Sheet that, for any small MS4 owned or operated by a jurisdiction identified on Table A.1 as "within an urbanized area," the permit's requirements apply only to portions of the MS4 within the [urbanized area].

> For these reasons, the Associations object to the designation of any jurisdiction on Table A.1 unless that jurisdiction owns or operates an MS4 within an [urbanized area]. And among the potential designees based on the [urbanized area] criterion, if a particular jurisdiction provides information that its MS4 is located outside of the [urbanized area], it should not be required to obtain permit coverage, and should be dropped from Table A.1 (unless the locality voluntarily elects to accept the designation.)

In addition, the Associations asserted that the baseline impervious area assessment used to calculate the twenty percent restoration requirement should not include any impervious area not served by the MS4. The Associations maintained that "a permittee is not responsible for nonpoint sources (properties with sheet flow from the parcel[s] into streams, creeks, etc.) and third-party direct dischargers (properties with their own discharge points into streams, creeks, etc.) that do not enter into and are not discharged from the permittee's MS4."

A third concern raised by the Associations is that the twenty percent restoration requirement and other terms of the permit exceeded the "maximum extent practicable" ("MEP") standard for many potential permittees and was therefore unlawful.

## D. *Final Determination*

On 27 April 2018, the Department issued a final determination to issue the general permit, together with a document entitled "Basis for Final Determination" that provided an explanation for its actions and responded to public comments addressed to the tentative determination. The Basis for Final Determination included information regarding a process and criteria used to designate MS4s located in non-urbanized areas. The Department also addressed comments regarding impervious area restoration requirements and concerns about permit conditions in excess of the MEP, into which we shall delve in greater detail later in this opinion.

Contemporaneous with the final determination, the Department sent a letter to the County, stating a different rationale than in the tentative determination for designating the entire geographic area of the County. In lieu of justifying inclusion of the County as a whole, based on a finding that it was located within an urbanized area, the Department explained, apparently for the first time, that it had evaluated MS4s outside of the urbanized areas and determined that the "County's stormwater discharges result in or have the potential to result in exceedances of water quality standards or other significant water quality impacts," and therefore were subject to regulation pursuant to 40 C.F.R. § 123.35(b)(1)(i).

The Department described the designation process and criteria as follows:

11

The Department's water quality criteria for evaluating MS4s in non-urbanized areas are based on the State's TMDL program and the Maryland Biological Stream Survey (MBSS).[11] Maryland's TMDL program includes water quality assessments found in the Integrated Report of Surface Water Quality [ ] which identifies waters that meet water quality standards, and waterways that are impaired or threatened and require TMDLs. Documentation includes watershed assessments, water quality data, and mapping of impaired waterways. These water quality analyses are reviewed by the Department to determine whether MS4 discharges may contribute to stream impairments or exceedances of water quality standards.

The MBSS data are a comprehensive compilation of local water quality conditions throughout the State of Maryland. The data are based on field protocols that evaluate stream impairments and water quality through fish and habitat indicators. The MBSS data show that streams receiving stormwater runoff from urban development often have degraded biological communities. Results of these field surveys provide ratings of "good", "fair", "poor", or "very poor" indicating overall stream health. The MBSS data are reviewed by the Department to determine whether MS4 discharges have the potential to impact biological and habitat conditions in local streams.

The Department stated that, in accordance with that process and criteria, it had evaluated MS4s in the County that are located outside the urbanized area and made the following findings:

- The majority of local TMDLs in Queen Anne's County are located outside of the urbanized area, and significant urban land use exists outside of the Centreville Urban Cluster. Local TMDLs include impairments for bacteria in Corsica River, Lower Choptank River Mainstem, Eastern Bay, Wells Cove, Wye River, and Lower Chester River; mercury in Tuckahoe Lake; nutrients in Corsica River and Middle Chester River; polychlorinated biphenyls (PCBs) in Corsica River; and phosphorus in Southeast Creek.

---

[11] TMDL is an acronym for "total maximum daily load," which is "a measure of the total amount of a pollutant from point sources, nonpoint sources and natural background, that a water quality limited segment can tolerate without violating the applicable water quality standards." *Potomac Riverkeeper, Inc. v. Maryland Dep't of the Env't*, 238 Md. App. 174, 185 (2018) (citation omitted).

- 26 MBSS stations located outside of the urbanized area indicate a score of poor or very poor stream health for numerous streams and watersheds. Many of these are located in unnamed tributaries in the Corsica River watershed and streams in the Chester River watershed including Red Lion Branch and Andover Branch.

- The 2016 Integrated Report documented that Rosin Creek and an unnamed tributary to the Upper Chester River are impaired due to total suspended solids (TSS), indicating that these streams do not meet water quality standards.

- Tributaries draining into the Centreville Urban Cluster and the Corsica River are impaired by an unknown source affecting aquatic life.

After setting forth its findings, the Department concluded that:

[s]tormwater discharges inside and outside of the County's urbanized area contribute to these water quality impairments and future MS4 discharges have the potential to cause significant water quality impacts.[12] Because of the link between the County's MS4 discharges and water quality impairment, the geographic area under the authority of Queen Anne's County has been designated by the Department for coverage under the general permit. Subsequently, the County must submit a Notice of Intent (NOI) in accordance with the general permit and obtain coverage under the NPDES MS4 program.

The County did not submit a Notice of Intent, but filed instead a petition for judicial review of the Department's final determination. The circuit court affirmed the Department's decision to approve and issue the general NPDES discharge permit. This appeal followed.[13] Additional facts will be introduced later in this opinion.

---

[12] In a footnote, which we have omitted, the Department provided a link to the water quality documentation referred to in the letter.

[13] The appeal was filed originally by the Maryland Small MS4 Coalition, representing Queen Anne's County and Cecil County, and by Queen Anne's County as a separately named party. Cecil County dismissed its appeal.

## STANDARD OF REVIEW

"In an appeal of the circuit court's review of an agency action, an appellate court reviews the agency's action itself rather than the decision of the circuit court." *Carroll County*, 465 Md. at 201 (citing *Hollingsworth v. Severstal Sparrows Point, LLC*, 448 Md. 648, 654 (2016)). "Our role is 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Richardson v. Maryland Dep't of Health*, 247 Md. App. 563, 569 (2020) (quoting *Milliman, Inc. v. Md. State Ret. and Pension Sys.*, 421 Md. 130, 151 (2011)), *cert. denied sub nom. Richardson v. Md. Dep't of Health*, 472 Md. 17 (2021).

"The standards for judicial review of a discharge permit – and their corresponding levels of deference to the agency – vary depending on whether the court is reviewing an agency's fact findings, discretionary decisions, or legal conclusions." *Carroll County*, 465 Md. at 201 (citing *Anacostia Riverkeeper*, 447 Md. at 118-21). The Court of Appeals summarized these varying standards as follows:

> *Review of Fact Findings*
>
> For fact findings, a reviewing court applies the "substantial evidence" standard, under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences. *Anacostia Riverkeeper*, 447 Md. at 120, 134 A.3d 892. In particular, with respect to factual issues that involve scientific matters within an agency's area of technical expertise, the agency is entitled to "great deference." *Id.*
>
> *Review of Matters Committed to the Agency's Discretion*
>
> With respect to matters committed to agency discretion, a reviewing court applies the "arbitrary and capricious" standard of review, which is "extremely deferential" to the agency. *Harvey v. Marshall*, 389 Md. 243,

14

296-99, 884 A.2d 1171 (2005); *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 529, 846 A.2d 341 (2004). This standard is highly contextual, but generally the question is whether the agency exercised its discretion "unreasonably or without a rational basis." *Harvey*, 389 Md. at 297, 884 A.2d 1171; Arnold Rochvarg, Maryland Administrative Law, § 20.1 at 255 (2011).

Under this standard, a reviewing court is not to substitute its own judgment for that of the agency and should affirm decisions of "less than ideal clarity" so long as the court can reasonably discern the agency's reasoning. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc*., 419 U.S. 281, 285-86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

*Review of the Agency's Legal Conclusions*

With respect to an agency's legal conclusions, a reviewing court accords the agency less deference than with respect to fact findings or discretionary decisions. *Anacostia Riverkeeper*, 447 Md. at 122, 134 A.3d 892. In particular, a court will not uphold an agency action that is based on an erroneous legal conclusion. *Id*. However, in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation.

*Id.* at 201-03.

Our review of the Department's final determination to issue the permit is based on the administrative record before the Department. EN § 1-601(d). We limit our review to objections raised during the public comment period. *Id.* If, however, the petitioner seeking judicial review demonstrates that "(i) [t]he objections were not reasonably ascertainable during the comment period; or (ii) [g]rounds for the objection arose after the comment period[,]" we must remand to the Department for consideration of such objections. *Id.* Remand is not required "if the proffered new objections are not materially different from objections that were already considered" by the Department. *Potomac Riverkeeper*, 238 Md. App. at 205.

ANALYSIS

The County identifies two provisions of the permit as relevant to this appeal. The first is the designation of the area subject to regulation. The County argues that the Department's designation of areas outside of the actual urbanized area of the County (1) exceeded the Department's authority, (2) was procedurally deficient, and (3) was not supported by substantial evidence.

The second provision the County challenges is the requirement that it commence restoration efforts for twenty percent of impervious acreage within the urbanized area. The County asserts that this condition unlawfully makes it responsible for third-party and nonpoint source stormwater discharges.

The County further asserts that the Department lacks authority to impose conditions that exceed the "maximum extent practicable" standard, and, therefore, the restoration requirement and any other permit conditions that exceed that standard are invalid. We shall address the County's contentions in turn.

## I.     Designation of Area Subject to Permit

The County concedes that the portion of its MS4 that is located in the actual urbanized area is subject to regulation under the CWA. The County asserts, however, that the Department's designation of MS4s outside of the urbanized area, based on purported links to broader and perhaps non-contemporary water quality impairments, was contrary to federal and State law because (1) the Department did not provide notice of the process or criteria used in the designation process until after the opportunity for public comment expired, and (2) the Department's finding of a causal or potentially causal connection

16

between waterbody impairment and discharge from County-operated MS4s outside of the urbanized area was not supported by substantial evidence.

The Department maintains that the County had ample opportunity to raise concerns regarding the area of designation because the County participated in informal discussions regarding the designation criteria in the federal regulations and their applicability to the County. The Department asserts further that, based on data showing impairments in water quality in rivers and streams flowing through the County, it was reasonable for the Department to find that County-operated MS4s located outside of the urbanized area at least contributed potentially to excesses in water quality standards or resulted in other significant water quality impacts in the County.

Based on our review of the administrative record, we conclude that, pursuant to EN §1-601(d), remand is required because the grounds for the Department's ultimate determination that there was a link between the County's MS4s and water quality impairments were not reasonably ascertainable during the comment period, but were evident only when the final determination was issued, after the comment period expired. We explain.

When the Department issued its tentative determination and published the draft general permit for public comment, the justification for designating all County-operated MS4s for regulation under the general permit was they were "located within an urbanized area." The County objected to that justification on grounds that only a small area of the County was actually an urbanized area. In the Department's final determination, however, it revised its justification for designating all MS4s in the County, asserting that, based on

17

criteria which apparently had not been made public previously, the Department had determined that "[s]tormwater discharges inside and outside of the County's urbanized area contribute to [ ] water quality impairments[,] and future MS4 discharges have the potential to cause significant water quality impacts."

The Department's contention that the County had an opportunity to object to the Department's designation of MS4s outside of the urbanized area prior to the issuance of the final determination is not supported by the record. The email correspondence that the Department highlights in support of this contention was sent prior to the tentative determination and explains the designation of the entire County pursuant only to the urbanized area criteria in 40 C.F.R. § 122.32(a)(1). The Department points also to documentation that demonstrates generally that the County participated in informal meetings regarding the Department's tentative determination. We can find nothing in that documentation, or elsewhere in the record, however, demonstrating that, prior to the expiration of the comment period, the County was put on notice of the Department's determination that MS4s outside of the County's actual urbanized area were subject to regulation based on a purported link to water quality impairments, pursuant to 40 C.F.R. § 123.35(b)(1)(i). Nor does it appear that such a determination was a foreseeable response to the comments made during the public comment period. *Cf. Potomac Riverkeeper*, 238 Md. App. at 211 (holding that interested parties had adequate opportunity to anticipate and comment on terms of final permit as such terms were a reasonably foreseeable response to public comments). We conclude that the County's objections to the final determination

18

regarding the area of designation were not "reasonably ascertainable" during the comment period, but were evident only upon issuance of the final determination.

Consequently, pursuant to EN § 1-601(d), remand is required to allow the County an opportunity to comment on the Department's determination that MS4s outside of the urbanized area of the County are subject to regulation under the NPDES, and so that the Department may consider the County's objections. To those ends, we shall vacate the circuit court's judgment affirming the Department's final determination as it pertains to the area of the County that is subject to regulation under the general permit and remand to the circuit court with instructions to remand to the Department for further proceedings consistent with this opinion.

Because the County concedes that the portion of its MS4 located within the actual urbanized area is subject to the permitting requirements of the Clean Water Act, we shall consider the remaining issues as they may apply to whatever the permit area turns out to be.

## II. Responsibility for Nonpoint Source Runoff and Third-Party Discharge?

The County contends that the Department exceeded its jurisdictional authority by imposing permit conditions that assign responsibility to the County to remediate pollutants in stormwater that does not enter the County's MS4, such as nonpoint source runoff or third-party discharge. In support of this contention, the County relies on 40 C.F.R. § 122.26(a)(9)(i)(A), which, as it applies to small MS4s, provides that "for discharges composed entirely of storm water . . . operators shall be required to obtain a NPDES permit

19

only if . . . [t]he discharge *is from* a small MS4 required to be regulated pursuant to [40 C.F.R.] § 122.32." (emphasis added).

On this point, the County focuses primarily on the requirement to restore twenty percent of all untreated impervious surface within the urbanized area. Because the entire urbanized area of the County is not served by the County's MS4, requiring restoration of twenty percent of the total impervious surface area within the urbanized area makes the County responsible for nonpoint source runoff that does not enter and therefore is not *discharged from* its MS4. Similarly, the County claims that the total impervious surface in the urbanized area includes privately-owned industrial, residential, and commercial developments that often have their own stormwater drainage systems and, therefore, the requirement to restore twenty percent of the total impervious surface area in the urbanized area assigns responsibility for third-party point source discharge that is not discharged from the County's MS4.[14]

The Department responds that neither the impervious restoration requirement nor any other provision of the general permit makes the County responsible legally for

_____

[14] On appeal, the County challenges two additional provisions of the permit: "Good Housekeeping" requirements, which direct the County to control stormwater on its own properties; and post-construction stormwater runoff control requirements, which direct the County to regulate stormwater on property where planned construction projects will disturb 5,000 square feet or more of land area. The County maintains that, to the extent such properties are not served by the regulated portion of its MS4, those conditions constitute unauthorized regulation of nonpoint source pollution discharge and are therefore invalid. We do not consider these objections as they were not raised during the public comment period. EN § 1-601(d). The only permit condition that appears to have been challenged as an unlawful regulation of nonpoint source runoff is the impervious surface restoration requirement.

20

discharges occurring outside of its MS4 system. The Department maintains that the impervious surface restoration requirement merely uses the extent of the County's urbanized area "as a means to calculate the amount of pollution reduction that the County must achieve to offset the water quality impacts of *its* MS4 system." The Department points out that the County is free to implement restoration requirements within the limits of its MS4 system, that any impervious areas in the urbanized area that is treated already with approved stormwater management practices or natural filtration is not included in the baseline assessment, and that liability for any unauthorized discharge of pollution from third-party point sources remains with the third party, not the County. The Department asserts that the decision of the Court of Appeals in *Carroll County* is dispositive on this point. Before examining the parties' contentions and applicable law in depth, a brief overview of the Chesapeake Bay TMDL and Maryland's responsibilities with respect to the Bay TMDL will be a useful point-of-departure.

### A. Chesapeake Bay TMDL and the Maryland Watershed Implementation Plan

Under the CWA, each state is directed to "identify waterways for which technology based effluent limitations are not achieving water quality standards." *Carroll County*, 465 Md. at 191 (citing 33 U.S.C. § 1313(d)(1)(A)) (footnote omitted). "If water quality standards are not being met in a waterway due to excess levels of a particular pollutant, the state is to determine the maximum amount of that pollutant that the waterway can receive without violating water quality standards – *i.e.*, the TMDL [total maximum daily load] for that pollutant as to that waterway." *Id.* (citing 33 U.S.C. § 1313(d)(1)(C)). In other words,

a TMDL is a "cap on the pollutant[,]" or, as it is sometimes referred to, a "'pollution budget' or 'pollution diet.'" *Id.* (citation omitted).

Generally, pollution limits established in a TMDL are apportioned to the relevant sources of that pollution, which include point sources and nonpoint sources. *Carroll County*, 465 Md. at 192 (citing 40 C.F.R. §§ 130.2(i), 130.7(c)). As alluded to earlier, a point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, [or other types of conveyance], from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). By contrast, nonpoint source pollution "comes from dispersed areas like farms or fields where water runs off the land without being collected or channeled into a point source." *Carroll County*, 465 Md. at 184 (footnote omitted). "The [CWA] does not require permits for nonpoint sources or otherwise directly regulate them[,]" although states, including Maryland, have regulatory programs that address nonpoint sources of water pollution. *Id.* at 185.

"The portion [of pollutant limits] assigned to each relevant point source is called a 'wasteload allocation.'" *Id.* at 192 (citing 40 C.F.R. § 130.2(h)). "The portion assigned to each nonpoint source is called a 'load allocation.'" *Id.* (citing 40 C.F.R. § 130.2(g)). "[T]he TMDL – in the sense of a numeric amount – for a given pollutant for a particular waterway is the sum of the wasteload allocations, the load allocations, the natural background, and the margin of safety." *Id.* (citing 40 C.F.R. §§ 130.2(i), 130.7(c)(1)).

In 2010, the EPA established a TMDL for the Chesapeake Bay, as part of an effort to restore the water quality of the Bay. *See Anacostia Riverkeeper*, 447 Md. at 106. The Bay TMDL "identifies the necessary pollution reductions of nitrogen, phosphorus and

sediment across Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and the District of Columbia and sets pollution limits necessary to meet applicable water quality standards in the Bay and its tidal rivers and embayments." Chesapeake Bay TMDL Executive Summary, 1.[15] These pollution limits are divided among the seven Bay jurisdictions according to major river basins. *Id.* at 7. For Maryland, the pollution limits for nitrogen, phosphorus, and sediment are allocated between the Susquehanna, Eastern Shore, Western Shore, Patuxent and Potomac basins. *Id.* (Table ES-1).

To achieve the goals of the Bay TMDL, the EPA directed each Bay jurisdiction to create a "Watershed Implementation Plan" ("WIP"), which "functions as a 'roadmap' for how and when the State will reach the pollution reduction goals set forth in the Bay TMDL." *Carroll County*, 465 Md. at 194-95 (citing *Anacostia Riverkeeper*, 447 Md. at 109). Each state was expected to subdivide the Bay TMDL allocations among pollutant sources and evaluate "current legal, regulatory, programmatic and financial tools available to implement the allocations; identify and rectify potential shortfalls in attaining the allocations; describe mechanisms to track and report implementation activities; provide alternative approaches; and outline a schedule for implementation." Chesapeake Bay TMDL Executive Summary, 8-9.

---

[15] The Chesapeake Bay TMDL Executive Summary is available here: https://www.epa.gov/sites/production/files/2014-12/documents/bay_tmdl_executive_summary_final_12.29.10_final_1.pdf (last visited 24 March 2021).

Maryland's WIP subdivided the Bay TMDL according to the following source sectors: wastewater, septic systems, regulated stormwater, sediment and erosion control, concentrated animal feeding operations, agriculture, atmospheric sources, and "other sources." Maryland's Final Phase I Watershed Implementation Plan – Executive Summary (Dec. 3, 2010) ("Maryland WIP"), ES-8.[16] As explained in the Executive Summary, strategies to be employed by the State to achieve the goals of the Bay TMDL included "increasing acres retrofitted with stormwater controls[.]" *Id.* at ES-5. Pertinent to this appeal, the Maryland WIP called for NPDES stormwater discharge permits for Phase I and Phase II MS4 jurisdictions to include a requirement for restoration of a percentage of impervious surface that does not have adequate stormwater controls.[17] Maryland WIP at 5-7, 5-8.

### B. General Permit Impervious Restoration Requirement

The Maryland WIP strategy to implement impervious surface restoration through the issuance of NPDES permits is incorporated into Part V of the general permit at issue in

---

[16] The Maryland Phase I Watershed Implementation Plan, including the Executive Summary, is available at:
https://mde.maryland.gov/programs/Water/TMDL/Documents/www.mde.state.md.us/assets/document/MD_Phase_I_Plan_12_03_2010_Submitted_Final.pdf (last visited 25 March 2021).

[17] An impervious surface, as alluded to briefly in n.10 at 9 *supra*, is one which "does not allow stormwater to infiltrate into the ground[,]" such as "rooftops, driveways, sidewalks, or pavement." EN § 4-201.1(d). As the Court of Appeals has observed, "the volume of stormwater runoff increases sharply with impervious cover." *Anacostia Riverkeeper*, 447 Md. at 125 (quoting the 2000 Maryland Stormwater Design Manual § 1.1, at 1.4). The purpose of restoring impervious surface is "to abate [] the increase in stormwater runoff and the discharge of pollutants because of the increase in impervious surfaces." *Id.*

24

this appeal. Permittees are required to develop a "baseline impervious area assessment" which is then used to calculate the twenty percent restoration requirement. For small MS4 counties designated for coverage in the general permit, the baseline is determined "according to the impervious surfaces within the urbanized area of that jurisdiction."

In addition to calculating the total impervious acres within the urbanized area, each permittee must submit information regarding the acreage within that area that is already treated with BMPs. The restoration requirement applies to twenty percent of the total impervious surface in the urbanized area that has no such treatment. The general permit requires permittees to commence restoration activities that will achieve the twenty percent restoration requirement by 2025.

### C. *Maryland Department of the Environment v. Carroll County, et al.*

The potential impact of this case compels a closer look. In 2014, Carroll County and Frederick County ("counties") were issued renewed Phase I permits for their respective medium MS4s. *Carroll County*, 465 Md. at 197. The permits included a requirement to restore twenty percent of impervious surface based on a county-wide total of unrestored impervious surface, although the counties' MS4s serve only a portion of the counties' geographic area. *Id.* at 230-31. The counties appealed, asserting the same argument made here: specifically, that NPDES permits regulate discharges of pollutants only from the MS4 itself, and, therefore, the county-wide baseline for impervious surface restoration exceeded the Department's authority under the CWA, as it made effectively the permittees responsible for discharges that never entered their MS4 systems. *Id.* at 231-33. The Court

25

of Appeals rejected that argument and upheld the county-wide impervious surface calculation as a basis for restoration requirements. *Id.* at 264.

The Court of Appeals began its analysis that led to that holding by noting that "the impervious surface restoration term is a water quality based effluent limitation authorized by 33 U.S.C. § 1342(p)(3)(B)(iii)."[18] *Id.* at 234. The Court stressed that such a requirement does not control directly pollution, but is, instead, "a surrogate or proxy for an amount of pollution to be reduced." *Id.* The Court explained that, according to Department guidance, the type and quantity of impervious surface restoration activities forms the basis for calculating loads of pollution reduced, "[t]hus, when the Department is determining how a county should calculate the number of impervious surface acres to be restored, the Department is effectively determining a measure of pollution reduction." *Id.*

The Court then noted that, according to EPA regulations, water quality based effluent limitations, such as impervious surface restoration, must be "derived from applicable water quality standards, without reference to a practicability test."[19] *Id.* at 234

---

[18] "Effluent limitations may be 'technology based' or 'water quality based." *Carroll County*, 465 Md. at 186 (citation omitted). "[T]echnology based effluent limitations are designed from the perspective of the discharger while controls based on water quality standards – water quality based effluent limitations – are designed from the perspective of the waterway." *Id.* at 211.

[19] The Court explained that, "'[d]eriving water quality-based effluent limits from water quality standards is the only reliable method for developing water quality-based effluent limits that protect aquatic life and human health.'" *Carroll County*, 465 Md. at 234 (quoting EPA, *National Pollution Discharge Elimination System: Surface Water Toxics Control Program – Final Rule*, 54 Fed. Reg. 23868, 23879 (2 June 1989) (additional citation omitted).

(citing 40 C.F.R. § 122.44(d)(1)(vii)(A)). Therefore, "when establishing how each [c]ounty is to calculate the number of impervious surface acres to be restored – *i.e.*, the proxy for an amount of pollution to be reduced – the [CWA] and EPA regulations direct the Department to focus on what is necessary to achieve water quality standards in the Bay and the waters that feed it." *Id.* at 235. The Court concluded that "the Department's use of a county-wide baseline as a reference point for calculating the impervious surface restoration condition does not exceed the Department's authority under the Act because the impervious surface restoration condition implements a stormwater wasteload allocation in a TMDL (specifically, the Bay TMDL) designed to achieve water quality standards." *Id.* at 235.

In explicating its rationale, the Court noted with approval an EPA policy allowing permitting authorities to allocate pollutant loads between point and nonpoint sources as needed to achieve the TMDL limit, "including potentially ratcheting up the requirements on point sources when necessary." *Id.* at 236. The Court concluded: "[t]hus, nonpoint source pollution reduction may be assigned to point sources – *i.e.* through wasteload allocations in the development of TMDLs." *Id.* at 237.

The Court noted further that, pursuant to 40 C.F.R. § 122.44(d)(1)(vii)(B), point source permits must "contain effluent limitations consistent with the 'assumptions and requirements' in wasteload allocations in applicable TMDLs." [20] *Id.* The Court concluded, in summary, that:

---

[20] In pertinent part, 40 C.F.R. § 122.44(d)(1)(vii)(B) provides:

(continued)

The impervious surface restoration term in the [c]ounties' MS4 permits is a numeric water quality based effluent limitation corresponding to Maryland's stormwater wasteload allocation within the Bay TMDL. As such, when crafting that limitation, the Department was authorized to focus on what would be necessary to achieve water quality standards, and the Department determined that the baseline calculation method it chose was necessary to achieve applicable water quality standards for the Bay. The Department did not exceed its authority under the Clean Water Act when it directed calculation of the impervious surface using a county-wide baseline.

*Id.* at 238.

### D. Analysis

The Department's response to adverse comments to the tentative determination to require MS4 permittees to restore twenty percent of untreated impervious surface throughout the urbanized area of the permittee's jurisdiction, including acreage that is not served by the MS4, was as follows:

Restoration requirements in the permit are based on the strategies outlined in Maryland's WIP for addressing stormwater discharges that impact the Chesapeake Bay. The WIP establishes the load reductions required to meet the Bay TMDL and the EPA has approved the 20% restoration strategy for meeting these targets. Conditions in the general permit must incorporate assumptions in the WIP so that Maryland may achieve the necessary pollution reductions.

We agree with the Department that, under *Carroll County*, the general permit condition that requires the County to commence restoration efforts on twenty percent of the

---

[w]hen developing water quality-based effluent limits under this paragraph the permitting authority shall ensure that . . . [e]ffluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 C.F.R. [§] 130.7.

28

impervious surface in the urbanized area does not exceed the Department's jurisdiction because just as in *Carroll County*, the permit condition at issue in this appeal is "a numeric water quality based effluent limitation corresponding to Maryland's stormwater wasteload allocation within the Bay TMDL." 465 Md. at 238.

The County attempts to distinguish *Carroll County*, asserting that the rationale for upholding the restoration requirement for medium MS4 operators was that responsibility for pollutant loads from nonpoint sources "had been . . . assigned to [medium MS4 operators] in the Chesapeake Bay TMDL." The County argues that the Bay TMDL, which was issued in 2010, did not "assign" responsibility to small MS4s for nonpoint source runoff and, therefore, the rationale in *Carroll County* does not apply here. We disagree.

As discussed, Maryland's WIP, which was submitted in 2010, the same year as the TMDL was established, called for an impervious surface restoration provision in all MS4 permits, including permits to be issued, beginning in 2012, to small MS4s, during Phase II of the permitting process. The Court of Appeals noted that the general permit applicable to Phase II small MS4s includes an impervious surface restoration term, *Id.* at 229 n.58, but the Court did not limit its holding to Phase I permits. Accordingly, we find no merit in the County's claim that *Carroll County* is distinguishable because the permittees in that case were medium MS4s that had previously been "assigned" responsibility for nonpoint source pollution.[21]

---

[21] The County submits that the reasoning in *Carroll County* "should be revisited for all MS4s, not just jurisdictions similarly situated to Queen Anne's County." As we have stated, "the ruling of the Court of Appeals remains the law of this State until and '[u]nless

(continued)

As the Court of Appeals observed, pursuant to 40 C.F.R. § 122.44(d)(1)(vii)(B), "the discharge permit for each point source is to contain water quality based effluent limitations consistent with the 'assumptions and requirements' of the wasteload allocation for that source in any applicable TMDL." *Id*. at 193. We find nothing in the federal regulations to suggest that a new discharge permit that is issued after a TMDL has been established is exempt from water quality based effluent limitations consistent with attaining that TMDL. We agree with the Department that the notion that the County advances - that the consistency requirement does not apply to any MS4 that was unregulated when the Bay TMDL was issued in 2010 - is contrary to the premise of a TMDL, which is "designed to achieve water quality standards." *Id*. at 235.

Moreover, it is clear that the consistency requirement applies equally to small MS4s. Permit requirements for small MS4s are set forth in 40 C.F.R. § 122.34. In pertinent part, subsection (c)(1) of that regulation provides that, "[a]s appropriate, the permit will include . . . [m]ore stringent terms and conditions, including permit requirements that modify, or are in addition to, the minimum control measures based on an approved total maximum daily load (TMDL) or equivalent analysis, or where the Director determines such terms and conditions are needed to protect water quality."

those decisions are either explained away or overruled by the Court of Appeals itself.'" *Scarborough v. Altstatt*, 228 Md. App. 560, 577-78 (2016) (quoting *Loyola Fed. Sav. & Loan Ass'n v. Trenchcraft, Inc*., 17 Md. App. 646, 659 (1973)). Thus, assent to the County's request in this regard is clearly above our pay grade. Of course, whether the relevant federal statutes or regulations are to be revised is also for others to consider.

In sum, we conclude that the impervious surface restoration requirement in the general permit, like that in *Carroll County*, is an authorized water quality based effluent limitation that represents a valid reallocation of pollutant loads from nonpoint sources to point sources and that implements a stormwater wasteload allocation in the Bay TMDL.[22] Accordingly, we hold that the Department did not exceed its authority under the Clean Water Act when it directed calculation of the impervious surface to be restored based on the total impervious surface within the urbanized area of the County that has little or no stormwater management.

### III.  Permit Conditions in Excess of the Maximum Extent Practicable?

As we noted earlier in this opinion, it is not feasible to apply numeric effluent limitations to the regulation of stormwater.  Accordingly, "Congress adopted a flexible approach to the control of pollutants in MS4s." *Anacostia Riverkeeper*, 447 Md. at 98. (citing 55 Fed. Reg. 48,038).  In lieu of numeric effluent limitations that are applied to other point sources, municipal stormwater permits "shall require controls to reduce the

---

[22]  Because we have concluded that the impervious surface restoration requirement represents a valid reallocation of pollutant loads from nonpoint sources to point sources, in order to achieve water quality standards based on the Bay TMDL, we need not address the County's alternative argument, which is that the requirement is unlawful because it makes the County responsible for third-party point source discharges in the urbanized area that do not enter the County's MS4.

As we understand *Carroll County*, the Department is authorized to impose an impervious surface restoration requirement that represents a reallocation of nonpoint source discharge to a point source in order to comply with the TMDL.  If the Department's determination to include the requirement may be affirmed on that basis, the alternative third-party argument is inconsequential.

31

discharge of pollutants to the maximum extent practicable . . . ."  33 U.S.C. § 1342(p)(3)(B)(iii).[23]

"Maximum extent practicable" is not defined in the CWA or by the EPA.  The "EPA has intentionally not provided a precise definition of MEP to allow maximum flexibility in MS4 permitting[,]" based on the rationale that "MS4s need the flexibility to optimize reductions in storm water pollutants on a location-by-location basis."  EPA, *National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges – Final Rule*, 64 Fed. Reg. 68722, 68754 (December 8, 1999) (codified at 40 C.F.R. § 122.34).

In *Carroll County*, the Court of Appeals held that "[t]he Department may lawfully include an impervious surface restoration requirement in an MS4 permit without reference to the MEP standard."  *Carroll County*, 465 Md. at 264.  The County disagrees with that, seeking favor in the dissenting opinion in *Carroll County*, which concluded that the CWA does not authorize the Department to impose requirements that exceed the "maximum extent practicable" standard.  *Id.* at 267 (J. Hotten, dissenting).

The County maintains that, aside from the impervious surface restoration requirement, the permit contains other beyond-MEP conditions that cannot be considered

---

[23]   Consistent with the CWA, the federal regulations applicable to small MS4 permits provide that "[f]or any permit issued to a regulated small MS4, the NPDES permitting authority must include permit terms and conditions to reduce the discharge of pollutants from the MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act." 40 C.F.R. § 122.34(a).

"water quality based effluent limitations," and, therefore, are not valid under *Carroll County*. Specifically, the County points to permit conditions that require mapping of the MS4 system, screening of outfalls, and implementation of "good housekeeping" plans for municipal properties where specified "key" activities are conducted.

The Department responds that the mapping, good-housekeeping, and pollution prevention permit conditions are water quality based conditions because they control indirectly the discharge of pollutants, but that, in any event, federal regulations allow imposition of conditions that are not "water quality based" if needed to protect water quality. Alternatively, the Department submits that the conditions challenged by the County do not exceed MEP and/or are otherwise authorized under federal law.

Permit requirements for small MS4s are set forth in 40 C.F.R. § 122.34. Subsection (b) of the regulation provides that such permits must "include requirements that ensure the permittee implements, or continues to implement" six "minimum control measures" ("MCMs") in the following categories: (1) public education and outreach on storm water impacts; (2) public involvement/participation; (3) illicit discharge detection and elimination; (4) construction site storm water runoff control; (5) post-construction storm water management in new development and redevelopment; and (6) pollution prevention/good housekeeping for municipal operations. 40 C.F.R. § 122.34(b). The permitting authority must identify the minimum elements for each MCM, although the regulations set forth specific minimum requirements for some MCMs and provide general guidance.

33

To implement the MCM, which is aimed at the detection and elimination of illicit discharges into the MS4, regulated small MS4s are required to develop a system map. In pertinent part, the regulation provides that, "at a minimum," the permittee must be required to develop a map showing "the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls[.]" 40 C.F.R. § 122.34(b)(3)(i)(A). The draft permit that accompanied the tentative determination required permittees to maintain a map of the MS4 "which identifies all pipes, outfalls, inlets, stormwater management best management practices (BMPs), illicit discharge screening locations, and surface waters[.]"[24]

In response to public comments regarding the required map features, the Department explained that "BMPs that manage stormwater are part of an MS4 and therefore are required to be mapped under this permit condition[,]" and that "[s]tormwater conveyances, including pipes, drainage swales, and ditches, are a major component of an MS4 and therefore are required to be included under this permit condition." The Department explained further that the location of BMPs was necessary to comply with

---

[24] The draft permit is not included in the record but is found on MDEC in the circuit court case: C-17-CV-18-000162, 7/26/18 "Supporting Document Record Documents 010" at 130-199.

34

State stormwater management regulations that require triennial inspections of stormwater management practices.[25]

The Department acknowledged that "the number of inlets could be substantial and will require a significant effort to map[,]" and, on those grounds, removed inlets from the mapping requirements for the current permit term. The Department noted that language in the final permit was "revised to include stormwater conveyances to clarify that the MS4 is not limited to pipe infrastructure."

In the final permit, the mapping condition reads as follows:

> In order to comply with this MCM, all permittees must:
>
> 1. Develop and maintain an updated map of the MS4 that identifies all stormwater conveyances, outfalls, stormwater best management practices (BMPs), and waters of the U.S. receiving stormwater discharges[.][26]

The County asserts that the mapping requirement is beyond MEP because it "far exceed[s]" federal requirements. We are not persuaded so. The federal regulation requires that "at a minimum," permittees must be required to map outfalls and receiving waters. 40 C.F.R. § 122.34(b)(3)(i)(A). It is otherwise up to the permitting authority to identify additional minimum elements to ensure that permittees develop, implement, and enforce a program to detect and eliminate illicit discharges into the MS4. Moreover, subsection(c)

---

[25]   *See* 40 C.F.R. § 123.35(f) (authorizing permitting authorities to "include conditions in a regulated small MS4 NPDES permit that direct the MS4 to follow an existing qualifying local program's requirements, as a way of complying with some or all of the [minimum control measure] requirements in [40 C.F.R.] § 122.34(b)[.]")

[26]   The phrase "surface waters" was replaced with "waters of the U.S. receiving stormwater discharges" to be consistent with the language in the regulation.

of the regulation vests the Department with discretion to include "[m]ore stringent terms and conditions, including permit requirements that modify, or are in addition to, the minimum control measures . . . where the [Department] determines such terms and conditions are needed to protect water quality." 40 C.F.R. § 122.34(c)(1). In accordance with the regulations, the Department identified two other map elements that it deemed essential: stormwater conveyances and BMPs.

As noted previously, in reviewing the exercise of discretion by an agency in its decision making, we do not substitute our judgment, but rather defer to the agency, unless its discretion was exercised unreasonably or without a rational basis. *Carroll County*, 465 Md. at 202. We are satisfied that the Department articulated a rational basis for requiring map features in addition to the minimum requirements set forth in the regulation.

The County asserts further that the Department's decision that the mapping requirement does not exceed MEP is not supported by substantial evidence. Again, we disagree.

In response to comments that the mapping requirement "may not be practical[,]" and is "well beyond an MEP level of effort over the five-year permit term," the Department explained that existing small MS4s had been "continually mapping" their systems, including inlets. The Department concluded that this "clearly demonstrates" that the mapping requirement is not beyond MEP.

The County appears to interpret the phrase "continually mapping" as evidence that existing small MS4s had been unable to comply with mapping requirements. Based on that interpretation, the County argues that the Department "failed to address how it is

practicable for *newly designated* Small MS4 permittees to complete the onerous mapping process" in five years when other permittees had been working on their maps for over a decade. We disagree with the County's interpretation of the Department's response.

When applying the substantial evidence test, we review the evidence in the light most favorable to the agency, "because agency decisions are presumed *prima facie* correct[.]" *Maryland State Highway Admin. v. Brawner Builders, Inc.*, 248 Md. App. 646, 657 (2020). We ask "'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *GenOn Mid-Atl., LLC v. Maryland Dep't of the Env't*, 248 Md. App. 253, 267 (2020) (quoting *Anacostia Riverkeeper*, 447 Md. at 120). "We defer to the agency's fact-finding and any inferences that the record supports." *Id.*

Viewing the evidence in the light most favorable to the Department, as well as in context, we construe the Department's explanation to mean that existing small MS4s had been able to comply with requirements to develop and maintain an updated map of their systems, *i.e.* "continually map" their systems, including charting of inlets. Accordingly, the Department inferred that it would not be impracticable for new permittees to comply with the less demanding mapping condition in the final general permit, which did not require location of inlets because of the "significant effort" involved. We conclude that the record supports the Department's decision that the mapping requirement in the general permit does not exceed MEP.

### *The Outfall Screening provision*

The regulations concerning permit requirements for the illicit discharge detection and elimination MCM provides guidance for permitting authorities, stating that the "EPA

37

recommends that the permit require the permittee to visually screen outfalls during dry weather and conduct field tests of selected pollutants as part of the procedures for locating priority areas." 40 C.F.R. § 122.34(b)(3)(iii). In accordance with that recommendation, the outfall screening provision in the general permit requires permittees to screen twenty percent of total outfalls each year, up to a limit of 100 outfalls annually.

In response to public comments that outfall screening would, for some small MS4 permittees, be equal to what is required for medium MS4s, the Department explained that the decision was based on "current level of effort of existing small MS4 permittees," some of which were "already screening close to 100 structures annually and exceeding requirements by conducting chemical tests of dry weather flows."[27] The Department explained further that, "[w]hile required to set a clear, specific, and measurable requirement, [the Department] determined that it should not be greater than what is required of Phase I MS4s and therefore capped the requirement at 100 outfalls." The Department also noted that outfall screening requirements for small MS4s require significantly less effort than Phase I permits. We are satisfied that the record supports the Department's decision that the outfall screening requirements are not beyond MEP.

---

[27] Public comments also included an assertion that outfall screening was not required by federal law. Although it is true that the regulations do not mandate outfall screening requirements, such conditions are recommended by the EPA. *See* 40 C.F.R. § 122.34(b)(3)(iii).

38

### *The Good Housekeeping provision*

Pursuant to 40 CFR § 122.34(b)(6), permits issued to small MS4s must "identify minimum elements and require the development and implementation of an operation and maintenance program that includes a training component and has the ultimate goal of preventing or reducing pollutant runoff from municipal operations." The regulation includes guidance from the EPA which recommends that the permit conditions address the following:

> Maintenance activities, maintenance schedules, and long-term inspection procedures for structural and non-structural storm water controls to reduce floatables and other pollutants discharged from the separate storm sewers; controls for reducing or eliminating the discharge of pollutants from streets, roads, highways, municipal parking lots, maintenance and storage yards, fleet or maintenance shops with outdoor storage areas, salt/sand storage locations and snow disposal areas operated by the permittee, and waste transfer stations; procedures for properly disposing of waste removed from the separate storm sewers and areas listed above (such as dredge spoil, accumulated sediments, floatables, and other debris); and ways to ensure that new flood management projects assess the impacts on water quality and examine existing projects for incorporating additional water quality protection devices or practices. Operation and maintenance should be an integral component of all storm water management programs.

40 C.F.R. § 122.34(b)(6)(ii).

In accordance with that regulation, the general permit issued by the Department requires permittees to "develop, implement, and maintain a pollution prevention plan at publicly owned or operated properties." The plan must include a description of site activities; a list of potential pollutants stored or used on site; written procedures designed to prevent discharge of pollutants; written procedures to address any on site release, spill or leak; and documentation of any such release, spill, or leak and corresponding response

actions.  The general permit also requires annual training for staff and contractors and documentation of pollution prevention efforts related to application of pesticides and fertilizer, snow and ice control, street sweeping, and inlet cleaning.

Objections to the good housekeeping provisions included comments that it (a) would be too time consuming, due to the number of properties involved, and (b) would serve little purpose, because not all publicly owned or operated properties discharge into the MS4.  In response to that comment, the Department added language to the permit to clarify that (a) permittees may create a standard plan for multiple facilities with similar operations, and (b) the requirement applied only to properties where certain "key site activities are performed that have a risk of discharging pollutants into stormwater."[28]

In our view, the Department's response to concerns that the good housekeeping provisions were beyond MEP addressed satisfactorily those concerns.  The County does not argue otherwise, nor does it assert any other reason why the provisions are beyond MEP.  Moreover, the requirements in the general permit appear to be consistent with the guidance provided in the regulation regarding the activities, schedules, and procedures that permit conditions should address.  Accordingly, we conclude that the Department did not act unreasonably or without a rational basis in exercising its discretionary authority, pursuant to 40 C.F.R. § 122.34(b)(6)(i), to identify the minimum elements of a pollution

---

[28] The "key site activities" listed in the permit are: maintenance of roads, inlets, vehicles, or heavy equipment; management of storage areas for vehicles or heavy equipment; and handling of deicers, anti-icers, fertilizers, pesticides, road maintenance materials such as gravel and sand, or hazardous materials.

prevention and good housekeeping program for property owned or operated by permittees. As the Department points out, if the County believes that it is not feasible for the County to comply with any of the requirements of the permit, the County may apply for an individual discharge permit tailored to its unique circumstances.

## CONCLUSION

Grounds for the County's objections to the determination that there was a link between the County's MS4s outside the urbanized area and water quality impairments were not ascertainable reasonably during the comment period. Accordingly, remand to the Department is required to allow the County an opportunity to comment on that proposed tentative determination.

We hold that, under the Court of Appeals' decision in *Carroll County*, the Department did not exceed its authority under the Clean Water Act when it directed that the amount of impervious surface to be restored be determined based on the total impervious surface within the urbanized area of the County that has little or no stormwater management.

Finally, we conclude that the Department articulated a rational basis and/or relied on substantial evidence in determining that mapping, outfall screening, and "good housekeeping" permit conditions did not exceed the "maximum extent practicable" standard.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY VACATED IN PART. CASE REMANDED**

**TO THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. JUDGMENT OTHERWISE AFFIRMED. COSTS TO BE PAID TWO-THIRDS BY APPELLANT AND ONE-THIRD BY APPELLEE.**